UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

_____

In re:

WEDGEWOOD PROPERTIES, LLC,

     Debtor.

_____/

JEFF A. MOYER, CHAPTER 7 TRUSTEE,

     Plaintiff,

-vs-

CONNIE ROGERS, WILLIAM STEPHEN,
and ESTATE OF DAVID FOSTER,

     Defendants.

_____/

Case No.  BG 18-04808
Chapter 7

Adversary Proceeding
No. 20-80139

## OPINION REGARDING AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

Appearances:

Andrew J. Gerdes, Esq., Lansing, Michigan, attorney for Plaintiff Jeff A. Moyer, Chapter 7 Trustee.

Scott Fenton Smith, Esq., Farmington Hills, Michigan, attorney for Defendants Connie Rogers and William Stephen.

I.       INTRODUCTION.

Defendants Connie Rogers and William Stephen invested a total of $635,000 in Wedgewood Properties, LLC (the "Debtor" or "Wedgewood"), on the advice of its sole member, Shawn Weera, who was also the Defendants' elder law attorney and personal friend. Although Weera held Wedgewood out as a real estate venture, and convinced the

1

Defendants and other individuals to invest on that basis, Weera and Wedgewood were actually engaging in highly speculative currency trading, commingling of funds, and transferring large quantities of money to offshore accounts held by non-Wedgewood entities controlled by Weera.   In short, by the time the Defendants invested in Wedgewood, it had devolved into a fraudulent scheme, perpetrated by Weera at the expense of his elderly clients.

The Defendants began losing trust in Weera when they suffered adverse tax consequences as a result of Weera's poor investment advice and their tax professionals encouraged them to seek legal assistance.   They ultimately retained Attorney David Foster to pursue state court litigation against Weera and Wedgewood for various causes of action including conversion of their funds and violation of applicable securities laws. This litigation resulted in a settlement under which Wedgewood and Weera were to pay the Defendants a total of $900,000, comprised of a large downpayment and smaller installment payments over time.   The Defendants received a total of $550,000 in downpayments and one installment payment of $10,000 before Weera died unexpectedly. The Defendants also received $98,063.15 pursuant to a garnishment of one of Wedgewood's bank accounts.

After Wedgewood filed its bankruptcy case, chapter 7 trustee Jeff A. Moyer (the "Trustee" or "Plaintiff") filed this adversary proceeding.  The complaint seeks to avoid the transfers made to the Defendants under the state court settlement agreement and garnishment as actual fraudulent transfers under § 548(a)(1)(A) of the Bankruptcy Code[1]

---

[1]      The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq*.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ __."

and § 544(b) and the Michigan Uniform Voidable Transactions Act (the "UVTA"). In support of this cause of action, the Trustee alleges that Wedgewood was a Ponzi scheme and that the presumption that applies to such schemes establishes that the transfers were made with the intent to defraud Wedgewood's creditors. The Trustee further argues that the Defendants, who were unquestionably innocent investors, knew enough about the Ponzi scheme through their pursuit of the state court litigation that they did not take the transfers in good faith for purposes of asserting a defense under § 548(c). The Trustee also seeks to avoid the transfers to the Defendants as constructively fraudulent under § 548(a)(1)(B) and Michigan law. He argues that the transfers unquestionably occurred when Wedgewood was insolvent and that the Defendants collectively received approximately $23,000 more than their original investments because of the payments. Finally, the Trustee raises an alternative argument that the garnishment should be avoided as a preferential transfer under § 547(b) and seeks recovery of any avoided transfers, jointly and severally from the Defendants, under § 550(a)(1).[2]

The adversary proceeding was tried before this court over the course of three days in August and October 2023. After the trial concluded, the parties filed written closing arguments, and the court took the matter under advisement.

---

[2]     Attorney Foster was originally named as a Defendant in this proceeding because the payments received by the Defendants were initially deposited in Attorney Foster's IOLTA account or his law firm's general operating account and because Attorney Foster retained a portion of the funds in satisfaction of his attorney's fees. Attorney Foster passed away during the pendency of this proceeding, and the Trustee reached a settlement with his probate estate just prior to the start of trial. Under the settlement, Foster's estate is to pay the bankruptcy estate $50,000 by September 1, 2024. If the payment is not made, the Trustee will have an allowed claim of $98,995.01 against Foster's estate. (*See* Order Approving Settlement Agreement, Base Case No. 18-04808, Dkt. No. 251.)

## II.    JURISDICTION.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); LGenR 3.1(a) (W.D. Mich.).  The claims alleged in this adversary proceeding for avoidance and recovery of fraudulent and preferential transfers constitute core proceedings.  28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  All parties have consented to this court entering a final order in this adversary proceeding.  (*See* Complaint, AP Dkt. No. 1, at ¶ 4; First Pretrial Order, AP Dkt. No. 20; Report of Parties Rule 26(f) Conference, AP Dkt. No. 25, at ¶ 3(g).)

## III.    FINDINGS OF FACT.

During the three-day trial of this adversary proceeding, this court heard testimony from four witnesses.[3]  The first was Kristin Lytle, a certified public accountant who was qualified as an expert witness to testify about the finances and operations of the Debtor, including whether it showed any indicia of being operated as a Ponzi scheme.[4]  Lytle became a CPA in 2021 and had never testified as an expert witness prior to being called in this proceeding.  She has, however, taken several continuing education courses in fraud and forensic accounting, works almost exclusively on issues involving bankruptcy estates, and has performed forensic accounting work and insolvency analyses for dozens

---

[3]      The consecutively paginated trial transcript is available on the court's docket at AP Dkt. Nos. 128, 130, and 142.  The transcript is cited herein as "Tr. at ___."

[4]      The Expert Report of Kristin Lytle, C.P.A. was admitted into evidence as Plaintiff's Exhibit 1.  It included sixty-nine exhibits, labelled A through QQQ.  Those exhibits are cited herein as "Plf. Exh. 1-___."

4

of bankruptcy cases.  Despite her relative lack of experience, the court found Lytle's expert report to be well-done and her testimony to be credible.

The Defendants, William Stephen and Connie Rogers, also testified at the trial. Rogers is in her early eighties, has a high school education and worked as an executive assistant until her retirement in 2004.  Her memory about the relevant facts in this case was sharp, and the court found her testimony to be credible. Stephen was ninety-one and a half when he testified at trial.  He also has a high school education and worked as a draftsman in the auto industry prior to his retirement.  From observing Stephen's testimony, it is clear to the court that Stephen is honest and intelligent, but that his memory and hearing are failing.  He struggled to answer even simple preliminary questions and did not remember signing or reviewing many of the important documents in this case. The court's observations are consistent with Rogers' testimony about Stephen's declining cognitive abilities, and with contemporaneous statements made by Rogers in emails and other correspondence during the time period at issue in this case.  Both Rogers and Stephen testified that the relevant communications in this case were made almost exclusively to Rogers, and that she would pass the information on to Stephen, whose understanding would "vary."  (Tr. at 462.)  For these reasons, the court has greatly discounted much of Stephen's testimony and concludes that it is entitled to almost no weight.

The final witness, Chapter 7 Trustee Jeff A. Moyer, testified primarily in support of the preference claim alleged in the complaint.  Trustee Moyer has been a chapter 7 trustee in this district for over twenty years and has represented trustees as an attorney for an additional twelve years before that.  Trustee Moyer's testimony was also credible.

5

The court admitted a majority of the Plaintiff's seventy-two proposed exhibits into evidence. All forty of the Defendants' exhibits were admitted into evidence.[5] Pursuant to an agreement placed on the record, the parties jointly submitted several additional documents after the conclusion of the trial, which consisted of the exhibits to two deposition transcripts that were already in evidence. The first of these depositions was of David M. Foster, the attorney who represented Rogers and Stephen in their state court lawsuit against Weera and Wedgewood.[6] Attorney Foster passed away prior to the trial in this adversary proceeding. As a result, the court did not have the benefit of his live testimony and has relied on the deposition transcript to provide context for its findings regarding the extent of his knowledge of Weera's fraud. The second transcript was from the deposition of David Allen Schmid, an employee of Huntington National Bank.[7] The parties previously agreed that Schmid's deposition would be used at trial in lieu of live testimony. Schmid's testimony focused on the garnishment of Wedgewood's bank account that occurred in August 2018.

Finally, two days after the conclusion of the trial, the Plaintiff filed a Motion to Reopen Proofs to Allow Plaintiff to Offer Exhibit 68 Into Evidence. (AP Dkt. No. 133.) Plaintiff's Exhibit 68 consists of emails between Attorney Foster and Nick Balberman, the attorney who represented Weera and Wedgewood in the state court litigation, about the

---

[5] Exhibits admitted into evidence at the trial are cited herein as "Plf. Exh. __" or "Dft. Exh. __."

[6] The transcript of the deposition of David Foster was admitted as Dft. Exh. A, and the supplemental exhibits are referenced herein as "Foster Dep. Exh. __."

[7] The transcript of the deposition of David Allen Schmid was admitted at Dft. Exh. B, and the supplemental exhibits are referenced herein as "Schmid Dep. Exh. __."

potential of mediating the case.  The Defendants objected for several reasons, including that the emails were inadmissible as "statement[s] made during compromise negotiations" under Fed. R. Evid. 408.  A hearing was held before this court on October 18, 2023.  At the conclusion of that hearing, the court took the issue under advisement.

Although the court believes the emails in Plaintiff's Exhibit 68 are largely cumulative of other evidence that has been offered in this case, they appear to have been made in anticipation of, but not during, ongoing settlement negotiations.  As a result, the court has determined to grant the Plaintiff's motion to admit Exhibit 68.  The exhibit is cited briefly in the court's findings of fact and has been given appropriate weight.

A. _Background on the Parties and their Relationship_.

The Debtor in this chapter 7 case, Wedgewood Properties, LLC, was formed as a Nevada limited liability company in June 2002.  (Complaint, AP Dkt. No. 1, at ¶ 9; Dft. Exh. F.[8])  The Debtor was owned and managed by its sole member, Shawn Weera. (AP Dkt. No. 1, at ¶ 9.)  When it was originally formed, the Debtor's purported business involved the ownership, development, and operation of commercial real estate.  (Dft. Exh. F., PPM at p. 5.)  After the real estate market downturn in 2008, Wedgewood shifted its focus to "investing in financial instruments, including stocks and currency trading."[9]  (Dft.

---

[8]    Defendant's Exhibit F includes a copy of the Confidential Private Placement Memorandum ("PPM") the Debtor sent to its investors pursuant to the LARA Administrative Consent Order.

[9]    Currency trading is also known as foreign exchange or "forex" trading.  At trial, Lytle generally defined currency trading as the process of taking U.S. or Canadian dollars and "trading on variance[s] of whether the dollar goes up or down."  (Tr. at 299.)  She further explained that currency trading "is considered a risky activity, so you can win big or you can lose big."  (Tr. at 256.)  Weera seemed to agree, as the Wedgewood PPM describes the forex market as "volatile" and carrying a "high level of risk." (Dft. Exh. F, PPM at p. 11.)  The PPM advises individuals to only invest in Wedgewood if they are "sophisticated and knowledgeable and . . . can bear the loss of the entire amount of the investment."  (Dft. Exh. F, PPM at p. 7.)

Exh. F, PPM at p. 5.)   The Trustee's expert witness testified that it was her understanding that Weera was "actively engaged" in currency trading in the years preceding Wedgewood's bankruptcy filing.[10]   (Tr. at 299-300.)   The account through which Weera conducted the currency trading, which the parties referred to as the "Oanda account," was in Weera's name, not Wedgewood's.  (Tr. at 177; 292; 301.)

In addition to operating Wedgewood, Weera was an attorney who provided estate planning and other legal services to his clients, many of whom were elderly.  (AP Dkt. No. 1, at ¶ 11; Tr. at 254.)   Rogers testified that she first met Weera when she retained him to prepare estate planning documents for her in 2005, on the recommendation of friends at her church who knew Weera and spoke highly of him.  (Tr. at 432.)   In connection with preparation of her will and trust, Weera also gave Rogers investment advice and suggested she purchase three annuities.  (Tr. at 432.)   Rogers explained that she did not have any financial expertise, but assumed that Weera was qualified to make financial recommendations.  (Tr. at 434.)   Over time, she grew to consider Weera a friend to the point that when Rogers and Stephen got married in 2011, Weera and his wife attended. (Tr. at 433-34.)  After Rogers and Stephen married, Weera continued to provide legal and financial advice and services to both of them.  Rogers testified that they usually met with Weera in person at their home, and that she was always present when Weera interacted with her husband.  (Tr. at 433; 435.)

---

[10]     Weera was engaged in these activities despite admittedly having no "formal training in finance or the securities industry."  (Dft. Exh. F, PPM at p. 12.)  The PPM indicates that Weera learned about currency trading "by attending conferences, seminars, tutorials, and academies, as well as by hiring private coaches and mentors."  (Dft. Exh. F, PPM at p.13.)

B. *Stephen's Initial Investment*.

On February 2, 2013, Stephen invested $50,000 in Wedgewood. (Dft. Exh. C.) Rogers testified that she was present when Stephen made this investment. (Tr. at 435.) She stated that Weera told Stephen that there was a group in Texas which was investing in real estate and that "it would be a good opportunity to get in on the ground level" with them. (Tr. at 435.) The handwritten receipt for this investment indicates that Weera promised Stephen a "guaranteed 3% interest" rate. (Dft. Exh. C.)

C. *The LARA Administrative Consent Order*.

In February 2015, the Michigan Department of Licensing and Regulatory Affairs ("LARA") issued a cease and desist order against Weera and Wedgewood relating to alleged violations of the Michigan Uniform Securities Act in two pending LARA cases. (Plf. Exh. 69; AP Dkt. No. 1, at ¶ 12.) Wedgewood, Weera, and LARA resolved the cases, and the terms of their settlement were incorporated in an Amended Administrative Consent Order (the "LARA Consent Order") which was entered on March 14, 2016. (Plf. Exh. 69.) The LARA Consent Order required Weera and Wedgewood to make a rescission offer to all investors, giving each investor the opportunity to either leave his principal and accrued interest invested in Wedgewood or to be promptly repaid all accrued interest and principal. (Plf. Exh. 69, at ¶ 3.) The order set forth additional requirements for the rescission offer, including that it be accompanied by a detailed private placement memorandum. (Plf. Exh. 69, at ¶ 3.) The order also prohibited Weera and Wedgewood from offering, selling, or accepting investments or loans from any individual or non-financial entity that was not a current Wedgewood investor as of the date of the order for a period of sixteen months. (Plf. Exh. 69, at ¶ 10.)

D. *Rogers and Stephen Make Additional Investments in Wedgewood*.

On March 24, 2016, Stephen invested an additional $100,000 in the Debtor. (Plf. Exh. 6.) The receipt provided by Weera does not indicate what interest rate Stephen was promised for this investment. (*Id.*)

In April 2016, Stephen invested another $330,000 in Wedgewood. (Plf. Exh. 7.) Rogers also made her first and only investment of $155,000 in April of 2016. (Plf. Exh. 8;[11] Tr. at 438, 447.) Rogers testified that she and Stephen funded these investments by taking money out of annuities they owned. (Tr. at 439; 441.) They did so on the advice of Weera, who assured them there would be minimal adverse tax consequences to them after he "work[ed] with the numbers." (Tr. at 439-40.) Rogers explained that she understood her investment to be in real estate. (Tr. at 438.) Rogers further stated that she was not aware that the LARA Consent Order prohibited Weera from selling securities to her because she was not a current Wedgewood investor at that time. (Tr. at 441-42.)

In early May, Rogers sent two emails to Weera, inquiring about why the checks she and Stephen had written in April had not been cashed. (Plf. Exh. 11 & 12.) In the emails, Rogers expressed concern over the delay and stated that she was "really nervous with the length of the process." (Plf. Exh. 12.) On May 6, 2016, Weera responded, indicating that the checks had been cashed and that "everything is fine." (Plf. Exh. 12.) Weera's message also stated that Stephen would be receiving a package in the next several days and encouraged them to "set it aside" until Weera could be there to open

---

[11]     Plaintiff's Exhibit 8 is a Wedgewood Properties statement provided by Weera to Rogers dated May 31, 2016. The statement confirms that the principal amount of her investment was $155,000 and indicates she was given a ten percent "bonus" on her investment and promised an interest rate of five percent. (Plf. Exh. 8.) Attorney Foster later speculated that the ten percent bonus was intended by Weera to compensate Rogers for the surrender charges she incurred when cashing out her annuity to fund her Wedgewood investment. (Dft. Exh. A, at p. 42-43.)

10

and review it with them.  (Plf. Exh. 12.)  The package Weera was referring to was the rescission offer and PPM required under the LARA Consent Order.  (Tr. at 443.)

E. *The Rescission Offer*.

The rescission offer addressed to Stephen is dated April 26, 2016.  (Dft. Exh. F.) On May 11, 2016, Weera visited Rogers and Stephen in their home to review the rescission offer with Stephen.  (Tr. at 444.)  Rogers recalled that they sat with Weera around the dining room table, with Weera and Stephen on one side and Rogers on the other.  (Tr. at 444.)  Rogers said she observed Weera "explaining something" to Stephen but could not hear the details of the conversation.  (Tr. at 444.)  She did not see Stephen actually read the rescission offer and testified that based on her knowledge of Stephen's capabilities at that time, she did not believe he could have understood it very easily.  (Tr. at 444-46.)

Regardless of his questionable understanding, Stephen signed the Subscription Agreement indicating that he wished to leave his money invested in Wedgewood pursuant to what the agreement depicted as a "new" promissory note.  (Dft. Exh. F.)  The PPM describes the new notes as being partially secured by a forty-five-acre parcel of undeveloped residential real property located at 7491 Old Lantern Drive in Caledonia, Michigan (referred to herein as the "Caledonia farm property").  (Dft. Exh. F, PPM at p. 5.) Wedgewood granted Weera's wife, Shelly Alman, acting as nominee for the lenders under the new Subscription Agreement, a mortgage on the Caledonia farm property on April 22, 2016.  (Plf. Exh. 62.)  Stephen also signed an Intercreditor Agreement and a blank Qualified Purchaser Questionnaire as part of the subscription package.  (Dft. Exh. F.)

11

F. *Email Communications During the Remainder of 2016*.

In the months after Stephen signed the new subscription package, emails from Rogers to Weera continued to reflect her concern over the lack of documentation and follow through from Wedgewood. In June 2016, Rogers wrote to Weera stating that she was concerned about the lack of communication from Wedgewood, as she and Stephen still had not received a contract even though two months had passed since their investments were made. (Plf. Exh. 16; Tr. at 487.) When Weera failed to address that issue in his brief response, Rogers emailed again the following week, reiterating her concern over the lack of documentation. (Plf. Exh. 16; Tr. at 485.) In that message, she told Weera she was "getting worried and not sleeping well." (Plf. Exh. 16.) The email also includes a comment about having previously told Weera about Stephen "not being as good." (Plf. Exh. 16.) At trial, Rogers explained that this was a reference to the fact that Stephen's memory "was a little not up to par" by this point. (Tr. at 450.)

Another group of emails, spanning between August 2016 and December 2016, show Rogers asking Weera questions about legal work he was supposed to be performing for Stephen – and reflect her subsequent frustration at Weera's failure to respond to her questions. (Plf. Exh. 17, 18, 19 & 20.) Rogers testified that this type of foot dragging was unusual for Weera. (Tr. at 492.) However, despite the concerns expressed in her emails, the tone of the messages remained friendly throughout these exchanges. (Dft. Exh. Q; Tr. at 455.)

Finally, Rogers' emails to Weera during this time period included several references to Stephen's failing memory. For instance, the email Rogers sent Weera about requested changes to Stephen's trust in August 2016 indicated that Stephen's "recall is

not the best and he vacillates from one time to another." (Plf. Exh. 17.)  A subsequent email from September 2016 encouraged Weera to speak directly to her, rather than to Stephen, because Stephen "doesn't process too well" and likely did not even remember the conversation they had in the spring of 2016.  (Dft. Exh. R.)

G. *The Tax Liability*.

In late January 2017, Rogers and Stephen received their 1099 tax forms, showing approximately $400,000 in taxable income.  (Tr. at 495.)  This was the income that resulted from cashing out their annuities, which they did at Weera's recommendation to fund their 2016 investments in Wedgewood.  After they received the 1099's, Rogers testified that Weera came to visit them "right away."  (Tr. at 496.)  Weera assured Rogers he would "take care of [the tax issues] personally," and he overnighted copies of the 1099's to Rogers and Stephen's "tax people."  (Tr. at 496.)

Rogers' emails to Weera in February 2017 reflect her extreme distress over this potential tax liability.  For instance, in an email dated February 8, 2017, Rogers stated that she just got off the phone with Weera.  She goes on to explain:

> I am a mess and a [sic] once again, in a holding pattern until Sunday.  I have not been sleeping, I am nauseated and very shaky.  I am so scared that we will have to report thousands of "income."  You have got to give me some assurance that we will be "ok" on our tax reporting to the IrS [sic] before we meet.

(Plf. Exh. 22.)  Several days later, on February 17, 2017, Rogers again emailed Weera asking him to follow up with the tax preparers.  In that email, she stated that she had "cried (privately), trembled" and been "nauseated" over the tax liability and knew that if she could not "come to grips with the situation" she would "get really sick."  (Plf. Exh. 24.) Throughout these exchanges, Weera told Rogers that he was working with her tax

preparer, Lynn, and that there was no need for Rogers to contact Lynn directly.  (Tr. at 505.)  Rogers heeded this advice. (Tr. at 505.)  The night before her appointment with her tax preparer, Rogers also recalled Weera telling her, "Well, Connie, you would have to pay taxes sooner or later, so you might as well get it out of the way and pay it now."  (Tr. at 498; 505.)

Rogers and Stephen met with Lynn at TaxSaver during "the week of Easter" in 2017 and were told that their tax liability was around $30,000.  (Tr. at 503.)  Rogers testified that she was "stunned" by this number.  (Tr. at 512.)  According to Rogers, Lynn informed her that Weera had known the full extent of the tax liability "right from the beginning," meaning as soon as he showed the 1099's to Lynn.   (Tr. at 502-03.)  Lynn eventually called her boss, Rob Mulcahy, into the meeting with Rogers and Stephen.  (Tr. at 515.)   Mulcahy talked with Rogers and Stephen and reviewed some paperwork Stephen had brought along relating to the Wedgewood investments.  (Tr. at 515-16.)  Based on this information, Mulcahy told Rogers and Stephen that they "needed a specialist" and advised them to contact an attorney.  (Tr. at 517.)

Rogers testified that she eventually came to believe that Weera had lied to her about the potential tax liability back in April 2016, and again in early 2017, when he knew the full extent of her tax liability but was not honest about it.  (Tr. at 499; 502.)  By April 2017, she had "lost faith" in Weera.[12]  (Tr. at 514.)

---

[12]     Interestingly, around this time, Weera was suspended from the practice of law for three years by the State of Michigan Attorney Discipline Board.  The consent order entered on March 25, 2017, stated that the suspension related to Weera's "professional misconduct in his representation of several elderly clients in creating 'asset protection plans;' providing investment advice" and failing to provide information and making misrepresentations in sworn statements during the Grievance Administrator's investigation.  (Plf. Exh. 70.)

14

H. *Rogers and Stephen Pursue State Court Litigation*.

1. Retention of Attorney Foster and Original State Court Complaint.

On April 18, 2017, Rogers and Stephen retained attorney David Foster to represent them in litigation arising from their investments in Wedgewood. (Plf. Exh. 28.) The engagement letter confirms that Rogers and Stephen met with Attorney Foster "to discuss what appears to be a fraudulent investment scheme by Shawn Weera."[13] (*Id*.) On May 2, 2017, Attorney Foster filed a complaint on behalf of Rogers and Stephen against Weera, Wedgewood and other parties in Wayne County Circuit Court. (Plf. Exh. 30.) The complaint asserted causes of action including statutory conversion, violations of Michigan securities law, negligence, breach of fiduciary duty, fraudulent misrepresentation, innocent misrepresentation, and legal malpractice. (*Id*.) The factual allegations of the complaint focused on Weera's misrepresentations about the nature and purpose of the Wedgewood investments he convinced Rogers and Stephen to make, his bad advice regarding the tax implications and other costs of cashing out their annuities to make those investments, and their belief that Weera had not actually invested their money but instead had put it to his own "personal use." (*Id*. at ¶ 43.) The only suggestion that Wedgewood bore any hallmarks of a Ponzi scheme appeared in the count for "Offer or Sale of Security

---

[13] At one point in his testimony, Stephen stated that Attorney Foster told him at their first meeting that "this guy" Weera was "a Ponzi scheme." (Tr. at 426-27.) Upon further questioning, Stephen stated that he understood that Ponzi schemes involved "[m]oney investments, I guess," but that he only knew that from reading about the Bernie Madoff case in newspapers and hearing about it on the radio. (Tr. at 425; 427.)

Other evidence in this case clearly establishes that Attorney Foster suspected Weera was involved in some type of fraudulent scheme when he first spoke to Rogers and Stephen. However, given Stephen's confusion at trial and the general unreliability of his memory, the court finds that Stephen's statement about the term "Ponzi scheme" being used should be given very little weight. Even if that phrase was used, Stephen's limited understanding of what that meant also render this testimony immaterial.

15

by Means of Any Untrue Statement of Material Fact or Omission of Material Fact," where

Weera's misconduct is alleged to have included:

a) Representing that the Wedgewood Properties "owned a group of properties by a group of investors".

b) Failing to disclose that Mr. Weera was the sole owner of Wedgewood Properties.

c) Failing to disclose Plaintiffs' monies were being invested in undeveloped real estate, unregistered securities, or foreign exchange instruments.

d) Failing to disclose to the Plaintiffs the risks of investing in undeveloped real estate, unregistered securities, and/or foreign exchange instruments.

e) *Failing to disclose that the source of re-payment of interest or principal were monies from other investors because Wedgewood Properties did not have assets that generated enough income to repay the Plaintiffs and other investors.*

f) Failing to provide a Private Placement Memorandum or Prospectus.

(*Id*. at ¶ 70 (emphasis added).)

In his deposition testimony, Attorney Foster offered insight into his knowledge and beliefs when he filed the original complaint. He recalled initially meeting with Rogers and Stephen, who he described as the "nicest people in the world" but who "didn't understand anything" about their Wedgewood investments or the potential fraud. (Dft. Exh. A, at p. 23; 78.) At that meeting, he reviewed the Wedgewood audited financial statement that had been provided to Stephen. From that statement, he got a "flavor" of what had occurred and crafted the complaint with a "focus" on the securities violations and the unsuitability of the investments Weera was offering. (*Id.* at p. 19.) Specifically, Attorney Foster explained that he could tell from the financial statement that Weera was selling securities, despite the fact that he was not registered to do so. (*Id.* at p. 19.) In addition,

16

the financial statement indicated that Weera was investing the money he received in foreign exchange instruments, which are generally not suitable for older investors. (*Id.* at p. 40-41.) This fact, coupled with the knowledge that Weera encouraged Rogers and Stephen to cash out safer investments, like their annuities, in favor of investing in Wedgewood, formed the basis for the "unsuitability" claim in the complaint. (*Id.* at p. 40-41.) Although Attorney Foster acknowledged the reference in the original complaint to the potential improper use of money from some investors to pay others, which can be one indicator of a Ponzi scheme, he stated that allegation was "not based on anything he knew" and was an embellishment thrown in "on the theory that maybe [he would] say something that hit." (*Id.* at 19-20.)

2. State Court Discovery Efforts.

After the filing of the state court complaint, Attorney Foster undertook discovery in an attempt to understand what had happened to the money Rogers and Stephen invested in Wedgewood. (*See, e.g.*, Plf. Exh. 38.[14]) In a letter dated August 22, 2017, Attorney Foster informed Rogers and Stephen that he had received some bank and wire transfer records and had determined that the $585,000 they had invested in March and April of 2016 was deposited in a Wedgewood checking account. He went on to explain his belief that:

> Within days or a couple of weeks at most, the $585,000 was withdrawn from the Wedgewood Properties, LLC bank account by Shawn Weera. This money was then wire transferred along with millions of other dollars in 2016.

> In all likelihood, this money has been transferred to Singapore and Malaysia and held in companies controlled by Shawn Weera but which have no assets or contacts with the United States.

---

[14] Plaintiff's Exhibit 38 is a transmittal letter from Attorney Foster to Rogers and Stephen dated August 10, 2017. In the letter, Attorney Foster references his attempt to subpoena bank records and Weera and Wedgewood's motion to quash that subpoena.

17

(Plf. Exh. 39.)  Attorney Foster concluded the letter by stating that he planned to consult with a couple of friends to seek their "thoughts on recovering this money from overseas." (*Id.*)

At trial, Rogers testified that she recalled receiving this letter from Attorney Foster. (Tr. at 533.)  She stated that it caused her to believe the money she and Stephen had invested in Wedgewood was "gone," but that she had assumed it might have been transferred to accounts in Sri Lanka, not Singapore or Malaysia, because that was where Weera was born and he still had family there. (Tr. at 534-36.)  When asked if the information in the letter led her to believe that Weera had committed a crime, Rogers stated, "I would say so."  (Tr. at 536.)

In late October and November 2017, Attorney Foster continued updating Rogers on the progress of discovery in the state court litigation.  (Plf. Exh. 40 & 42.)  For instance, on November 13, 2017, he sent Rogers an email stating that he had received more bank records and would be filing an amended complaint detailing "exactly what happened" with their money. (Plf. Exh. 42.)  Rogers testified that she did not ask Attorney Foster to explain this further and stated that he did not provide her with a copy of the amended complaint at that time. (Tr. at 539-40.)  She explained that she was, "of course," wondering what had happened, but still assumed that their money "went to Sri Lanka" and that Weera "was going to be filthy rich through that."  (Tr. at 539-40.)

3.   The First Amended Complaint.

Attorney Foster eventually obtained leave to file an amended complaint in the state court.  He informed Rogers of this in an email dated December 8, 2017.  (Plf. Exh. 44.) In the email, Attorney Foster advised Rogers that the "next steps" would include seeking

summary disposition on the statutory conversion count of the complaint, among others. He also indicated that he had been in touch with a friend who was previously in the Secret Service who might have overseas contacts who could assist in getting their money back. (*Id.*)

The First Amended Complaint was filed in the state court on December 11, 2017. (Plf. Exh. 35.)  It set forth the same general claims as the original complaint but included more factual details about the disposition of Rogers' and Stephen's funds.  With regard to Stephen's initial $50,000 investment, the amended complaint alleged that Weera used that money to pay other investors the interest owed on their investments or to pay personal expenses.  (*Id.* at ¶ 27; 30-39.)  The amended complaint suggests that this $50,000 was "used in a 'Ponzi Scheme.'"  (*Id.* at ¶ 59.)  By contrast, the amended complaint asserted that Weera transferred the subsequent investments to bank accounts overseas.  It specifically alleged that the $100,000 Stephen invested in March 2016 was initially deposited in a Fifth Third Bank account before being transferred to Weera's foreign bank accounts.  (*Id.* at ¶ 41-42.)  It also alleged that the $155,000 and $330,000 Rogers and Stephen invested in April 2016 were deposited in Wedgewood's Fifth Third checking account.  (*Id.* at ¶ 49.)  The next day, Weera wrote himself a $70,000 check from these funds.  (*Id.* at ¶ 49.)  Approximately two weeks later, he wired $400,000 to HSBC Bank USA, NA, and then transferred the funds to banks in Sri Lanka or Malaysia.  (*Id.* at ¶ 49-50.)

Attorney Foster testified about the circumstances that led to the filing of the amended complaint at his deposition.  He explained that the focus of the amended complaint was still on the unsuitability of the Wedgwood investments and Weera's

unregistered sale of securities.  (Dft. Exh. A., at p. 34.)  However, by this point, he had obtained bank records, specifically from Wedgewood's Bank of America account around the time of Stephen's initial $50,000 investment in February 2013.  (*Id.* at p. 104.)  Those bank statements showed several payments being made to individuals soon after Stephen's investment.  (*Id*. at p. 104-06.)  Although Attorney Foster did not know if these individuals were Wedgewood investors and had "no idea" about the specific terms of any such investments, these bank records formed the basis for the allegation in the amended complaint that Stephen's $50,000 may have been used in a Ponzi scheme.  (*Id*. at 104; 106.)  He stated that this allegation was "never substantiated," in part because discovery proved so difficult and because settlement occurred soon after the filing of the amended complaint.  (*Id.* at p. 45.)

I. *State Court Motion for Summary Disposition and Case Evaluation*.

In February 2018, Attorney Foster filed a motion for summary disposition on behalf of Rogers and Stephen in the state court litigation.  Like the amended complaint, the brief filed in support of the motion references the allegation that Stephen's initial $50,000 investment may have been used to pay other investors in a Ponzi scheme. (Plf. Exh. 36, at p. 4, 10.)  The broader focus of the motion, however, is its request for summary disposition on the statutory conversion, securities fraud, fraudulent misrepresentation, and legal malpractice claims asserted by Rogers and Stephen.

The litigation was referred to case evaluation, and Rogers and Stephen ultimately obtained a $2 million case evaluation award.[15]  (Dft. Exh. A, at p. 100.)  According to

---

[15]    After the case evaluation, Attorney Foster and Weera's attorney exchanged emails about the potential for mediating the case.  (Plf. Exh. 68.)  In the first of those emails, dated February 23, 2018, Attorney Foster indicated that he had "no interest" in mediating the case for several reasons, including that he already had the case evaluation award and had "bank records that

Attorney Foster, this result was one of the primary factors that "caused settlement talks to finally begin." (*Id*. at p. 100-01.)

At his deposition, Attorney Foster explained that he used the term "Ponzi scheme" in his state court pleadings to add "a little pizzazz or sex appeal." (Dft. Exh. A, at p. 60.) He also stated that he was posturing, to some extent, because he knew that his opposing counsel were "not securities attorneys." (*Id.* at p. 58.) Attorney Foster maintained that he never came to "a belief or an understanding that Shawn Weera or Wedgewood Properties was a Ponzi Scheme or [was] being operated as a Ponzi Scheme." (*Id*. at p. 8.)  More specifically, Attorney Foster explained that Wedgewood may have been a Ponzi scheme as to other investors, but there was no evidence it was as to Rogers and Stephen. (*Id*. at p. 8-10.)

J.  *Settlement of the State Court Litigation*.

Settlement talks in the state court case eventually led to a resolution, and Rogers and Stephen entered into a Mutual Settlement Agreement, Confidentiality Agreement, and Mutual Release with Weera, Wedgewood, and the other state court defendants on April 13, 2018.  (Plf. Exh. 48.)  Under the Settlement Agreement, Weera and Wedgwood were to pay Rogers and Stephen a total of $900,000, via a $550,000 downpayment and execution of a $350,000 promissory note, which was to be paid in $10,000 monthly installment payments over the following three years.[16] (Plf. Exh. 48.)

---

prove all of my Clients' monies were used in a Ponzi Scheme or stolen." (*Id.*)  The court notes that this statement is consistent with the allegations Attorney Foster made in the state court pleadings.

[16]    Testimony offered at trial suggested that Rogers and Stephen were either granted a mortgage on Weera's residence as part of the settlement agreement or that Attorney Foster otherwise "went after" the house as part of the collection process.  (Tr. at 463-64; 469.)  Eventually, a dispute over this alleged mortgage apparently arose with Weera's wife, Shelly

K.   *Payments to Rogers and Stephen Pursuant to Settlement Agreement*.

   1.   Settlement Downpayment.

The downpayment owed to Rogers and Stephen under the Settlement Agreement was paid via three separate cashier's checks, all dated April 20, 2018.[17]  The first check was drawn on the Wedgewood Properties, LLC account at Macatawa Bank, was in the amount of $225,000, and was jointly payable to Stephen and Attorney Foster.  (Plf. Exh. 49, at p. 2.)  The second cashier's check, drawn on the same account, was also for $225,000 and was payable to Rogers and Attorney Foster.  (Plf. Exh. 49, at p. 3.)  The third cashier's check, in the amount of $100,000, was drawn on Wedgewood's account at Chemical Bank and was made payable to Rogers, Stephen, and Attorney Foster.  (Dft. Exh. FF.)  It is not clear why the checks were issued in this manner and in these particular amounts.  Attorney Foster testified that the payments were not structured this way at his instruction.  (Dft. Exh. A, at p. 79.)

Attorney Foster deposited all three cashier's checks into his client trust fund account.  (Dft. Exh. A, at p. 79.)  He subsequently issued checks from that account to his law firm on April 27, 2018, and to Rogers and Stephen on April 28, 2018.  The law firm, David M. Foster, P.C., was paid $82,500, which represents approximately fifteen percent

---

Alman.  (Tr. at 547.)  Rogers and Stephen received $50,000 in settlement of that dispute in or around March of 2019.  (Tr. at 547; *see* Plf. Exh. 57, at p. 3.)

[17]     The evidence about these payments was complicated by the fact that Weera had previously obtained two cashier's checks – one from Chemical Bank for $100,000 and one from Macatawa Bank for $450,000 – made payable to Balberman and Associates, the law firm that represented Weera and Wedgewood in the state court litigation.  (Dft. Exh. DD & EE.)  Both checks were dated April 12, 2018.  (*Id*.)  The $100,000 cashier's check was subsequently redeposited or voided due to insufficient funds.  (Dft. Exh. EE; Tr. at 108; *see also* Plf. Exh. 1-G.)  The $450,000 check was redeposited as "not for the purpose intended" or because it was determined that Balberman and Associates was not the correct recipient of that check.  (Tr. at 263.)

22

of the settlement down payment and was described by Attorney Foster as the contingency fee he received as "part of [his] retainer agreement." (Dft. Exh. A, at p. 80; Foster Dep. Exh. 9.) Stephen received a check for $331,426.50 and Rogers received a check for $136,073.53. (Foster Dep. Exh. 9.) Attorney Foster explained that these amounts were determined pursuant to an agreement between Rogers and Stephen and represented each party's pro rata share of the settlement proceeds based on their total Wedgewood investments. (Dft. Exh. A., at p. 81-82.) Attorney Foster delivered these checks to Rogers and Stephen in person and recalled that they were "beyond tears" when they received the money. (*Id*. at p. 82.)

2. Source of the Settlement Downpayment.

Evidence offered at trial established that the $450,000 paid by Wedgewood to Rogers, Stephen, and Foster via the two cashier's checks from Macatawa Bank was traceable to the sale of the Caledonia farm property. (Tr. at 264.) Specifically, Wedgewood received a check for $462,995.19 from Transnation Title Agency on September 5, 2017. (Plf. Exh. 1-I.) The Trustee's expert witness, Lytle, testified that this check was the proceeds from the sale of the Caledonia farm property. (Tr. at 128.) The check was deposited in Wedgewood's Macatawa Bank account the following day. (Tr. at 128; Plf. Exh. 1-J.) Lytle explained that the "lion's share" of these proceeds were then used to fund the $225,000 payments to Rogers and Stephen, respectively. (Tr. at 129.)

By contrast, Lytle opined that the $100,000 payment from Wedgewood's account at Chemical Bank was funded, at least in part, by funds Wedgewood received from other investors. (Tr. at 104.) In support of this assertion, Lytle cited bank statements showing that the Chemical account had a balance of $88,730.47 at the beginning of April 2018.

23

(Plf. Exh. 1-G.)  The statement further shows $100,000 was deposited in the account on April 9, 2018.  (*Id.*)  Lytle determined that this deposit corresponded to a check written to Wedgewood by Doris Compton and Kathleen Dahnke, presumed individual investors, on April 6, 2018. (Plf. Exh. 1-G, at p. 6.)  Without this deposit, the account would not have had sufficient funds to make the payment to Rogers and Stephen.  (Tr. at 107; 109-10.)

For her part, Rogers testified that it never occurred to her that the funds she and Stephen received under the settlement may have come from other investors.  (Tr. at 544.) Instead, she assumed that Weera got the money for the $550,000 down payment "[f]rom part of the money he had sent to the third world countries."  (Tr. at 543.)  Rogers also testified that she was not aware that either Wedgewood or Weera were insolvent at the time the settlement was reached, and did not learn that until after Weera died approximately two months later. (Tr. at 461; 553-54.)

3. First Installment Payment.

On May 28, 2018, Weera made the first $10,000 payment on the promissory note established under the Settlement Agreement.  (Plf. Exh. 51.)  The payment was made via a check to Rogers and Foster.  (*Id.*)  The check was deposited in Attorney Foster's general operating account.   On June 1, 2018, Attorney Foster transferred $8,425.26 of these funds to Rogers and Stephen via a check from David M. Foster, P.C.  (Foster Dep. Exh. 10.)

L. *Weera's Death and Settlement Default*.

Shawn Weera died on June 15, 2018.  (AP Dkt. No. 1, at ¶ 9.)  After his death, Wedgewood and Weera defaulted on the monthly payments owed to Rogers and Stephen under the Settlement Agreement.  (Tr. at 321.)  The default led Attorney Foster to reopen

the state court case and to seek entry of a consent judgment.  (Plf. Exh. 53 & 54.)  The state court entered a consent judgment in the amount of $350,000, less any payments already made, against Weera, Wedgewood, and Weera's law firm on July 16, 2018. (Plf. Exh. 55.)

M. *The Post-Settlement Garnishment*.

After the consent judgment was entered, Attorney Foster attempted to enforce the judgment against Wedgewood.  One of the attempts involved preparation of a Request and Writ for Garnishment directed against Wedgewood's account at Chemical Bank. Attorney Foster signed the writ on August 7, 2018, and the Clerk of Court entered it on August 8, 2018.  (Plf. Exh. 56, at p. 1.)  Attorney Foster testified at his deposition that he personally delivered the writ of garnishment to a Chemical Bank branch that was located near his office on August 14, 2018.  (Dft. Exh. A, at p. 91.)  He explained that he walked into the bank, inquired as to who could accept service of the writ, and was referred to a bank employee named Shalitha Bennett, who represented that she was authorized to accept service.  (Dft. Exh. A, at 91-92.)  The proof of service attached to the garnishment indicates that the writ was personally served on Bennett on August 14, 2018, at 4:03 p.m. (Plf. Exh. 56, at p. 2.)

The Garnishee Disclosure subsequently prepared by Chemical Bank states that the writ was received on August 17, 2018, which happens to be exactly 90-days prior to the filing of Wedgewood's bankruptcy case.  (Plf. Exh. 56, at p. 4.)  David Schmid, a current bank employee,[18] offered some context about the bank's general procedures, and

---

[18]     Schmid is employed by Huntington National Bank.  He testified that Huntington acquired Chemical Bank through a "merger of equals" between Twin City Federal Bank ("TCF") and Chemical in 2020.  (Dft. Exh. B, at p. 8.)  Schmid explained that he had knowledge of the bank's garnishment procedures from his prior position at TCF and testified that Chemical's procedures

the possible explanation for the discrepancy in dates between the proof of service and Garnishee Disclosure.  Schmid testified that the bank's procedures contemplated that service of garnishment could be done by "walk-in" at a specific branch.  (Dft. Exh. B, at p. 18-19.)  He also stated that an Assistant Branch Manager, such as Bennett, would have had authority to accept service.  (*Id.* at p. 36; 38.)  Schmid confirmed that the bank's internal records showed that Bennett was personally served with the garnishment at a banking center location on August 14, 2018.[19]  (*Id.* at p. 16-17; 19.)  Upon receipt of the writ, Schmid explained that the bank's procedures would have required Bennett to promptly send an electronic copy of the writ to the levy and garnishment department for processing, and that the hard copy would have been forwarded via courier or inter-office delivery. (Dft. Exh. B, at p. 20.)  Bank records indicated that the garnishment department received the Wedgewood documents on August 17, 2018, at 1:18 p.m.  (Dft. Exh. B, at p. 21; Plf. Exh. 61.)  Schmid testified that the bank's procedures required the garnishment department to list the date the bank received the garnishment on the Garnishee Disclosure, which in this case was August 14, 2018.  (*Id.* at p. 28.)  He speculated that the bank employee who filled out the disclosure may have made a mistake in using the

---

for accepting service of garnishment in 2018 were the same as Huntington's current procedures. (Dft. Exh. B, at p. 9.)  Schmid's testimony was limited, however, by his lack of personal knowledge about the particular garnishment in this case and potentially, by the fact that his prior personal experience was with TCF's procedures, not Chemical's.  On cross examination, Schmid acknowledged that Chemical may have had different procedures than TCF when it came to receipt of garnishments, and that other individuals may have had better knowledge of that.  (Dft. Exh. B, at p. 53.)  For various reasons, those individuals were not made available to the parties and the court in this proceeding.

[19]     Schmid's testimony on this point was based, at least in part, on an email sent during the pendency of this litigation by an attorney for the bank named Sarah Sessler.  In that email, Sessler stated that bank records showed that the "Certificate/Affidavit of Service was signed by an Assistant Banking Center Manager on August 14, 2018." (Schmid Dep. Exh. 2.)

August 17, 2018 date, which is when the paperwork was received by the garnishment department, instead. (*Id.* at p. 29.)

After the garnishment department received the writ, Chemical put a hold on the account and debited the balance of $98,063.15.  These funds were sent to Attorney Foster and deposited in his IOLTA account on September 17, 2018.  (Foster Dep. Exh. 12.) Foster retained a portion of these funds to cover his attorney's fees and paid the remainder to Rogers and Stephen via two checks posted on September 24, 2018, in the amounts of $24,111.44 and $59,031.44, respectively. (Dft. Exh. A, at p. 90; Foster Dep. Exh. 12.)

N. *The Bankruptcy Case*.

The personal representative for Weera's probate estate filed a chapter 7 petition on behalf of Wedgewood on November 15, 2018.  Jeff A. Moyer was appointed as the chapter 7 trustee.   On August 1, 2019, Rogers and Stephen filed a joint claim for $203,294.00, based on amounts that remained owing under the state court Consent Judgment.  (Plf. Exh. 57.)  Trustee Moyer filed the present adversary proceeding on November 6, 2020.

At trial, Trustee Moyer testified about the claims and assets in this chapter 7 base case, including his efforts to recover estate assets through the pursuit of various avoidance actions.  His rough calculations were reflected in a summary admitted into evidence as Plaintiff's Exhibit 67.  Trustee Moyer explained that he expected unsecured claims in the case to total $5.46 million, at a minimum.  (Tr. at 322-23.)  As of August 9, 2023, the estate had $322,000 on hand and held or had the potential to obtain three additional judgments totaling approximately $674,000. (Plf. Exh. 67.)  If the estate were

to recover 100% on these judgments, which the Trustee believed was a generous assumption given the nature of the defendants and claims, the maximum amount in the estate was likely to be approximately $996,000. (*Id.*; Tr. at 324-27.) This would permit a maximum distribution to unsecured creditors of approximately 18%.[20]  (Plf. Exh. 67.)

Moyer then compared this projected distribution to the amount received by Rogers and Stephen as a result of the prepetition garnishment.  He estimated, based on the proof of claim filed by the Defendants, that they were owed $343,251 under the Consent Judgment as of August 17, 2018.[21]   Pursuant to the garnishment, they received $98,063.15 of this amount, or approximately 28.56% of the balance owed. (Plf. Exh. 67.) Based on these calculations, Trustee Moyer concluded that the Defendants received more as a result of the garnishment than they would have if the transfer had not been made and they had been paid as general unsecured creditors in the chapter 7 case, thereby satisfying the § 547(b)(5) requirement of the Trustee's preference claim.  (Tr. at 326.)

---

[20]     Section 547(b)(5) requires a comparison of the amount a preference defendant received to what that defendant would have received in the chapter 7 case "if the transfer had not been made."  11 U.S.C. § 547(b)(5)(B).  Theoretically, if the garnishment had not occurred, the estate would have an additional $98,063.15 in assets and the Defendants would have had an additional claim for this amount.  This alters the estimated distribution slightly, but it remains under 20%. The court finds that this potential error in the Trustee's calculation is not material, particularly in light of the other, very conservative estimates used by the Trustee, including his assumption that the estate would not incur any future administrative costs.  (Tr. at 325.)

[21]     Trustee Moyer's math on this point was not shown on his summary.  He testified, however, that he determined the amount owed to the Defendants under the consent judgment, with interest, based on the Defendants' proof of claim.   The claim states that the balance owed to the Defendants under the consent judgment as of August 17, 2018, was $343,251.  (Plf. Exh. 57.) The $98,063.15 paid to the Defendants under the garnishment is 28.56% of $343,251.

O.   *Expert Testimony Regarding Wedgewood's Business and Solvency*.

As previously noted, the Trustee retained Kristin Lytle, C.P.A. as a forensic accounting expert to opine on Wedgewood's business operations and solvency during the roughly six years preceding the bankruptcy filing. Lytle prepared an Expert Report, which was admitted into evidence as Plaintiff's Exhibit 1, and an electronic spreadsheet summarizing her findings, which was admitted as Plaintiff's Exhibit 2.   Lytle was also qualified to offer expert testimony at trial.   In formulating her conclusions, Lytle relied upon: proofs of claim and supporting documentation filed in both the bankruptcy case and Weera's probate case; bank statements and checks; documents from Wedgewood's office, Weera's law office, and other businesses provided by Weera's wife, Shelly Alman, who served as the original personal representative of Weera's probate estate prior to her death; documents from Timothy Waalkes, the subsequent personal representative for Weera's estate; and documents from other Wedgewood investors or their attorneys.  (Tr. at 82-84; Plf. Exh. 1, at p. 1-2.)

Based on this information, Lytle's report cites five instances where she determined that funds from new investors in Wedgewood were used to repay prior investors.  (Plf. Exh. 1, at p. 2-5.)  Two of these examples involved the transfers to the Defendants in connection with the Settlement Agreement downpayments on April 20, 2018 (i.e., the two $225,000 cashier's checks that were funded by the proceeds of the sale of the Caledonia farm property and the $100,000 cashier's check that was partially funded by deposits from other investors), which the court has already addressed.  (*Id.* at p. 3-4.)  The other three instances involved repayments to investors made on May 25, 2016, September 25, 2017, and February 21, 2018, respectively.   At trial, Lytle walked through the example of

29

Mary Hamming, who invested almost $300,000 in Wedgewood in June and September 2016, and was repaid this full amount on September 25, 2017.  (Tr. at 90-91; *see also* Plf. Exh. 1, at p. 2.)  Lytle explained that the Wedgewood account at Chemical Bank, from which the payment to Hamming was made, had a zero balance as of September 10, 2017.  (Tr. at 91.)  Bank records showed deposits in the total amount of $415,900 from three other individual investors on were made on September 11 and 14, 2017. (Tr. at 92.)  Lytle concluded that the payment to Hamming could not have been made without the funds from these other investors.  (Plf. Exh. 1, at p. 2; Tr. at 85-96.)  The two other payments cited in Lytle's report followed a similar pattern.  (Plf. Exh. 1, at p. 3-5.)

Lytle also concluded that Weera regularly diverted Wedgewood's funds to other business or personal accounts, commingled funds in the various accounts, and used personal and other business funds to pay Wedgewood's obligations to investors.  (Plf. Exh. 1, at p. 10.)  In support of this conclusion, Lytle's report cited twelve instances in which transfers were made from Wedgewood's accounts at Bank of America and Chemical Bank to a joint personal checking account held by Weera, his wife Shelly Alman, and his sister-in-law Sheri Alman, Weera's law office business account, Weera's personal savings account, and an account for Strategic Financial Solutions.[22]  (Plf. Exh. 1, at p. 5-9.)  These transfers occurred between May 2014 and June 2018, and were in amounts ranging from $3,000 to $180,000 each.  (*Id.*)  The report also cited seven examples of transfers from non-Wedgewood accounts, primarily the joint checking account or Weera's

---

[22]    At trial, counsel for the Trustee represented that Strategic Financial Solutions was "another non-Wedgewood-Weera-controlled entity."  (Tr. at 170.)  Lytle testified that she had reviewed a bank statement for this account, but no other evidence about this account was offered at trial.  (Tr. at 173.)

Oanda trading account, being used to fund payments to individual Wedgewood investors. (Plf. Exh. 1, at p. 8-10.)  Transfers in this category occurred during 2013, 2014 and 2015. (*Id.*)  The amounts of these transfers were between $5,000 and $50,000.[23]  (*Id.*)

Finally, Lytle opined that Wedgewood was "continuously insolvent" from May 1, 2012, through the bankruptcy filing date of November 15, 2018.  (Plf. Exh. 1, at p. 12.) Lytle began her solvency analysis by valuing Wedgewood's assets as of May 1, 2012. (Tr. at 178.)  These assets included two parcels of real property in Bexar County, Texas, valued at $573,680 and $77,380 respectively, as well as the Caledonia farm property, which she valued at $475,000.[24]  (Plf. Exh. 1, at p. 11.)  Wedgewood also had $7,892.03 in its Bank of America account as of May 2012.  (*Id.*)  The total value of these assets was $1,133,952.03. (*Id.*)

Lytle next estimated the amount of Wedgewood's liabilities as of May 1, 2012.  (Tr. at 187.)  She began this part of her analysis by identifying approximately twenty-two individuals who had invested in Wedgewood before that date and who still had outstanding investments.  (Tr. at 187; Plf. Exh. 1-SS.)  For investors who had been receiving periodic monthly payments from Wedgewood as of May 2012, she assumed that the same payments had been made in prior months, thereby reducing the amount owed by Wedgewood to these investors.  (Plf. Exh. 1, at p. 11-12.)  Based on this

---

[23]      Lytle testified that the transfers to and from Wedgewood's accounts that were listed in her report were not the only ones she found, and that there were "easily hundreds" more that were omitted from the report for "brevity and clarity."  (Tr. at 216-17.)

[24]      Lytle testified that she valued Wedgewood's real property based on the sales prices obtained when Wedgewood sold the properties in December 2012, April 2016, and September 2017.  (Tr. at 180-84; Plf. Exh. 1, at p. 11 & n. 74-77.)  As a result, her valuation almost certainly overstates the value of these assets as of May 2012.  (*Id.*)

31

methodology, Lytle estimated that Wedgewood owed investors $3,650,262.52 as of May 1, 2012.  (Plf. Exh. 1, at p. 12.)  She testified that Wedgewood had no liabilities, other than amounts owed to investors to her knowledge.  (Tr. at 299.)  Therefore, she calculated that Wedgewood was insolvent in the amount of $2,516,310.49 on May 1, 2012.  (Plf. Exh. 1, at p. 12.)

Lytle continued this analysis for the time period after May 1, 2012, until the bankruptcy petition date of November 15, 2018.  During this time, she accounted for new investments by adding those amounts to Wedgewood's assets and liabilities.[25]  Changes to Wedgewood's assets mostly reflected funds received from new investments and fluctuations in bank account balances.  Lytle's full solvency analysis is set forth on Plaintiff's Exhibit 1-QQQ and shows that Wedgewood was insolvent in amounts ranging between $2.3 million and $6.8 million throughout the six-year prepetition period.[26]

## IV.    DISCUSSION.

A. *The Fraudulent Transfer Claims*.

In this case, the Trustee's fraudulent transfer claims are premised on his allegation Wedgewood was operated as a Ponzi scheme.  In general, a Ponzi scheme is "a fraudulent investment arrangement under which an entity makes payments to investors from monies received from new investors rather than from profits generated by legitimate

---

[25]    From May 2012 through May 2018, there were approximately twenty additional individual investors in Wedgewood.  (Plf. Exh. 1-EEE; Plf. Exh. 2 at "Investments Post-2012" Tab.)

[26]    The only exception occurred in July 2015, when Wedgewood was insolvent in the amount of $360,811.89.  (Plf. Exh. 1-QQQ.)  Lytle testified that this resulted from a "cash infusion from a non-Wedgewood account," specifically Weera's Oanda trading account, that was "only in the Wedgewood account for a few days."  (Tr. at 204.)

business operations." *Rieser v. Hayslip (In re Canyon Systems Corp.)*, 343 B.R. 615, 629 (Bankr. S.D. Ohio 2006).  Investors in a Ponzi scheme are typically "promised high rates of return on their investments" and early investors often receive these returns, "creating the impression of a legitimate, or at least profitable, business" thereby "enticing new investors into the plan." *Id*. at 630 (citing *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993)).   However, in the absence of legitimate business operations, assets, or investments to generate funds to pay the promised returns to investors, the success of a Ponzi scheme essentially "guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors." *Id*. (citing *In re Taubman*, 160 B.R. at 978).

Based on the assertion that Wedgwood was a Ponzi scheme, the Trustee argues that the transfers made to Rogers and Stephen under the state court Settlement Agreement and garnishment should be avoided as fraudulent transfers.[27]   Section 548(a)(1)(A) addresses actual fraudulent transfers and "provides that a transfer of the debtor's property" made in the two years prior to the bankruptcy case "may be avoided if

---

[27]    The Trustee has brought his actual and constructive fraudulent transfer claims under § 548(a)(1) of the Bankruptcy Code, and in the alternative, under § 544(b) and the Michigan Uniform Voidable Transactions Act ("UVTA"), Mich. Comp. Laws § 566.31 *et seq*.  The primary difference between fraudulent conveyance causes of action under the Bankruptcy Code and state law is that § 548(a)(1) only applies to transfers made within two years of the petition date, while the Michigan UVTA has a look-back period of six years from when the claim accrues.  *See* Mich. Comp. Laws § 600.5813; *Borock v. Telesz (In re Ventimiglia)*, 198 B.R. 205, 210 (Bankr. E.D. Mich. 1996) (discussing the difference between prior versions of § 548 and Michigan fraudulent conveyance law).

In this case, it is undisputed that the challenged transfers were made within two years of the bankruptcy petition date and clearly fall under the purview of § 548.  As a result, the court has focused its analysis on the § 548 claims and will only reference the Michigan UVTA when its provisions materially differ from § 548.

Although the Trustee has not specifically identified a "triggering creditor" into whose shoes he may step for purposes of § 544(b), the claims register in this case establishes the existence of several creditors holding unsecured claims against Wedgewood.

33

the debtor made it with the actual intent to hinder, delay, or defraud his creditors." *Meoli v. The Huntington National Bank (In re Teleservices Group, Inc.)*, 444 B.R. 767, 787 (Bankr. W.D. Mich. 2011), *aff'd in part*, 848 F.3d 716 (6th Cir. 2017). Section 548(a)(1)(B) applies to transfers made with a constructive intent to defraud creditors and provides that transfers of the debtor's property in the two years prior to the petition date may also be avoided if the transfer (1) was made while the debtor was insolvent; and (2) the debtor received less than a reasonably equivalent value in exchange for the transfer. *Id*.

In the context of a Ponzi scheme, a trustee who establishes that a transfer to an investor in the scheme was made with actual intent to defraud will generally be permitted to recover the full amount of the transfer, unless the investor can establish a defense under § 548(c) by showing that he or she "received payments from the scheme for 'value and in good faith.'" *See Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 877-78 (Bankr. N.D. Ill. 2000). Avoidance of Ponzi scheme payments as constructively fraudulent, by contrast, typically results in the trustee recovering only the amounts received by an investor in excess of his or her initial investment. *Id.* at 871; *see also* Kathy Bazoian Phelps & Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes* § 3.02[1] (2012). This is because good faith Ponzi scheme investors are generally understood to hold colorable claims for the return of their original investment, and payments up to the amount of that original investment are viewed as "reasonably equivalent value" because they proportionally reduce those claims.[28] *In re*

---

[28] The § 548(c) defense available to transferees that take for good faith and value applies to constructive, as well as actual, fraudulent transfers. The practical import of the defense, however, is somewhat limited in the constructive fraudulent transfer context because issues regarding the value exchanged and the good faith of the transferee are considered in connection with a plaintiff's *prima facie* case and application of the restitution claim theory. *See, e.g., The Ponzi Book*, at § 3.02[3][b] & [d] (explaining that "courts have generally found that reasonably equivalent value

34

*Lake States Commodities, Inc.*, 253 B.R. at  871 (citing *Jobin v. McKay (In re M & L Business Machine Co.)*, 84 F.3d 1330, 1335 (10th Cir. 1996) (additional citation omitted)); *The Ponzi Book*, at § 3.02[3][b] (referring to this principle as the "restitution claim theory"). Payments in excess of the amount invested, on the other hand, are generally "considered fictitious profits because they do not represent a return on legitimate investment activity" and are typically not viewed as having been made for reasonably equivalent value.  *In re Lake States Commodities, Inc.*, 253 B.R. at 872; *see also The Ponzi Book*, at § 3.02[2][a] & n. 12 (noting a developing split of authority on this issue but stating that "[m]any courts conclude that the debtor receives no reasonably equivalent value in exchange for the payment of profits to investors in a Ponzi scheme").

In this case, Rogers and Stephen invested a total of $635,000 in Wedgewood. They received a total of $560,000 in transfers pursuant to the Settlement Agreement, comprised of the $550,000 downpayment and the single $10,000 installment payment, and an additional $98,063.15 pursuant to the garnishment, for an overall total of $658,063.15.  The extent of Rogers and Stephen's potential fraudulent transfer liability is therefore greatly affected by whether the transfers are deemed to have been made with actual fraudulent intent, in which case the transfers could be avoided in their entirety, or constructive fraudulent intent, in which instance the transfers would only be avoided to the extent they exceeded the initial investments.  The result in this proceeding is also

---

is exchanged by the investor for the return of principal" under the restitution claim theory and that application of the restitution claim theory is usually limited "to situations where the investor acted in subjective good faith; in a constructive fraud context, the plaintiff bears the burden of establishing both these elements).

greatly impacted by the Defendants' ability to successfully establish a good faith defense under § 548(c), particularly as it pertains to the actual fraudulent transfer claims.

    1.  Actual Fraudulent Transfer Claim.

To avoid the transfers to Rogers and Stephen as actual fraudulent transfers, the Trustee must establish that the transfers were of Wedgewood's property, occurred within two years of the filing of the bankruptcy petition, and were made with "actual intent to hinder, delay, or defraud" Wedgewood's creditors. 11 U.S.C. § 548(a)(1)(A). There is no dispute in this case that the first two elements have been met: the funds were Wedgewood's property and the transfers occurred in April, May, and August of 2018, all within approximately seven months before the bankruptcy filing. Therefore, the dispositive question with regard to the Trustee's *prima facie* actual fraudulent transfer claims is whether Weera and Wedgewood made the transfers to Rogers and Stephen with actual fraudulent intent.

Direct evidence of actual intent to defraud is rarely available so the intent to defraud must often be inferred from circumstantial evidence surrounding the challenged transfers. *See Schilling v. Heavrin (In re Triple S Restaurants, Inc.)*, 422 F.3d 405, 416 (6th Cir. 2005). This circumstantial evidence is sometimes referred to as "badges of fraud," which are objective factors, such as the transfer being made to a relative, being made in secret, or involving grossly inadequate consideration, "which raise a rebuttable presumption of actual fraudulent intent."[29] *Dymarkowski v. Nadeau (In re Nadeau)*, 2023 WL 6332837,

---

[29]    The badges of fraud identified in the Michigan UVTA include:

    (a) The transfer or obligation was to an insider.
    (b) The debtor retained possession or control of the property transferred after the transfer.
    (c) The transfer or obligation was disclosed or concealed.

at * 8 (Bankr. N.D. Ohio Sept. 28, 2023) (unpublished opinion) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541, 114 S. Ct. 1757 (1994)).

When the challenged transfers are made within the context of a Ponzi scheme, as has been alleged here, actual intent to defraud may also be established through application of the "Ponzi presumption."  Under the Ponzi presumption "transfers made to investors in furtherance of a Ponzi scheme are deemed to have been made with actual intent to hinder, delay or defraud creditors" as a matter of law.[30]  *Rieser v. Hayslip (In re*

---

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f)  The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

*See* Mich. Comp. Laws § 566.34(2).

[30]   The rationale for the Ponzi presumption has been further described as follows:

One can infer intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

*Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987) (cited in *The Ponzi Book*, at § 2.03[1][a]).

*Canyon Systems Corp.)*, 343 B.R. 615, 637 (Bankr. S.D. Ohio 2006) (explaining that transfers made in the course of a Ponzi scheme or other illegitimate enterprise "could have been made for no purpose other than to hinder, delay or defraud creditors"); *see also Emerson v. Maples (In re Mark Benskin & Co.)*, 59 F.3d 170, 1995 WL 381741 *5 (6th Cir. June 26, 1995) (unpublished table decision) (noting that the Sixth Circuit has long held "that the question of intent to defraud in a Ponzi scheme 'is not debatable'"); *Ritchie Capital Management, LLC v. Stoebner*, 2014 WL 1386724, *27 (D. Minn. Jan. 6, 2014) (unpublished opinion) ("The existence of a Ponzi scheme is . . . essentially 'one big badge of fraud.'") (quoting *In re Polaroid Corp.*, 472 B.R. 22, 35 (Bankr. D. Minn. 2012), *aff'd*, 779 F.3d 857 (8th Cir. 2015)).   The fact that the Ponzi presumption applies only to transfers made "in furtherance" of the scheme places an important limitation on the presumption, making the inference of actual intent to defraud future investors and creditors only appropriate "where the transfers at issue somehow perpetrate the Ponzi scheme."   *Ritchie Capital Management*, 2014 WL 1386724 at * 32; *see also Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Group, LLC)*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007) (explaining that, even when the debtor is a Ponzi scheme, the analysis of intent to defraud should "focus precisely on the specific transaction or transfer sought to be avoided" and suggesting that the repayment of valid antecedent debts may be distinguished from the payment of fictitious balances and profits).

    a.  Was Wedgewood a Ponzi Scheme?

  To determine whether Wedgewood was a Ponzi scheme such that application of the Ponzi presumption is appropriate, the court must consider several factors including whether:

38

(1)     deposits were made by investors;

(2)     the Debtor conducted little or no legitimate business operations as represented to investors;

(3)     the purported business operations of the Debtor produced little or no profits or earnings; and

(4)     the source of payments to investors was from cash infused by new investors.

*In re Canyon Systems Corp.*, 343 B.R. at 631.  Other hallmarks of a Ponzi scheme may arise when the Ponzi perpetrator makes unrealistic promises of returns on the investments, "mischaracterizes the nature of the investment opportunities" and associated risks, commingles investors' funds or uses the funds for other purposes, or encourages investors to "roll over or extend their investments rather than receive back their principal."   *The Ponzi Book*, at § 2.03[1][b] (citations omitted).   The evidence presented at trial demonstrated that Weera and Wedgewood exhibited many of these characteristics.

In total, there were approximately forty individual investors who made deposits in Wedgewood from 2008 through 2018.  The documentation attached to Lytle's report suggests that these individual investors were promised rather modest interest rates, ranging from three to five percent per annum.  (Plf. Exh. 1-DDD & EEE.)  Accordingly, the evidence does not support a finding that Weera promised Wedgewood investors an excessive return on their investments.  Yet even without this feature, Wedgewood's business model had many of the other traits of a Ponzi scheme.  To begin, Wedgewood conducted little or no legitimate business.  By 2008, Wedgewood's own documentation states that it had shifted its focus from what may have been legitimate commercial real estate activities to highly speculative currency trading.  Lytle testified that Weera appears to have been actively engaged in currency trading in the years leading up to

39

Wedgewood's bankruptcy filing.  Regardless of whether currency trading constitutes a "legitimate business operation," it is clear from the evidence and testimony at trial that such trading was not being done in Wedgewood's name or with Wedgewood accounts. There is no evidence that Wedgewood ever profited or produced earnings from these purported currency trades.[31]  Even worse, Weera was not honest about the true nature of Wedgewood's business and actively led individuals like Rogers and Stephen to believe that they were investing in real estate when that was not the case.  Weera's dishonesty and fraud continued even after entry of the LARA Consent Order, when he convinced Stephen to retain his investments in Wedgewood at a meeting that occurred around Rogers and Stephen's kitchen table.

With no legitimate business being conducted in Wedgewood's name, it is clear from the evidence presented at trial that the money moving in and out of Wedgewood was mostly smoke and mirrors.  For instance, Lytle was able to identify at least five examples of payments being made to investors with funds from subsequent investments. More troubling, Lytle identified numerous occasions on which funds were transferred and commingled between Wedgewood's accounts, and other personal and business accounts held by Weera.  In short, the picture painted at trial showed Weera exploiting the trust of his elderly investors, Wedgewood having no legitimate business operations, and funds being freely transferred between entities – and often to Weera himself – as he struggled to keep the whole enterprise afloat.  The court concludes that Wedgewood was a Ponzi scheme.

---

[31]    Lytle's report includes three examples of money being transferred from Weera's account with the currency trading platform Oanda to Wedgewood and then being used to pay investors. However, there is no evidence that Wedgewood directly profited from Weera's currency trading activities.

b.  Were the Transfers to Rogers and Stephen "In Furtherance" of the Ponzi Scheme?

The transfers at issue in this proceeding are somewhat unique because they were not direct payments of interest or withdrawals made as part of the on-going Ponzi scheme, but instead were made pursuant to a state court Settlement Agreement arrived at after Rogers and Stephen sued Wedgewood and Weera on a variety of theories, including conversion and securities fraud.  Even so, the court has no trouble concluding that the transfers were made in furtherance of the Ponzi scheme.  Of course, the court did not have the benefit of hearing from Weera at trial and can only surmise the factors that may have motivated him to enter into the Settlement Agreement, and make the subsequent payments, to Rogers and Stephen.  It is reasonable to infer, however, that Weera was motivated at least in part by a desire to end the state court litigation before it revealed even more aspects of his fraud.   This is consistent with the strategy Weera employed in other contexts, including in connection with the LARA Consent Order, of dragging his feet as long as possible and ultimately agreeing to some form of relief before the full extent of his fraud came to light.  Under these circumstances, the Ponzi scheme presumption applies to the transfers at issue and compels the inference that the transfers were made with actual intent to defraud.  The Defendants have offered no evidence to rebut that presumption.

Even if Wedgewood was something other than a classic Ponzi scheme, the court has no trouble concluding that Weera and Wedgewood made the transfers to Rogers and Stephen as part of an on-going fraudulent scheme and with actual intent to defraud other creditors.  Weera preyed on elderly clients who trusted him by encouraging them to invest in Wedgewood, which he held out as a real estate venture but which, at best, was actually

41

engaged in extremely risky currency trading. When his fraudulent business practices were at risk of being unveiled by Rogers and Stephen's lawsuit, he chose to settle that litigation. The majority of the settlement payments were not made with other investors' funds, but with proceeds of the sale of the Caledonia farm property. Even so, this was to the detriment of other investors who had chosen to remain invested in Wedgewood after the LARA Consent Order and were promised an interest in the Caledonia farm property as collateral for their renewed investments. Weera was a fraud, and the payments he caused Wedgewood to make to the Defendants under the Settlement Agreement were made with actual intent to continue that fraud.[32]

c. Good Faith Defense Under § 548(c).

After a trustee establishes a prima facie case for avoidance of transfers made with actual intent to defraud, the initial transferee may assert a defense to liability for the transfer under § 548(c) to the extent she (1) took the property in "good faith" and (2) "gave value to the debtor in exchange" for the transfer. *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 729 (6th Cir. 2017) (citing 11 U.S.C. § 548(c)).[33] In the context of an actual fraudulent transfer, § 548(c) is generally construed as providing an affirmative defense to avoidance to the extent of the value given and, as a result, the burden of proof is on the

---

[32]    The court questions whether the $98,063.15 transfer, which was made involuntarily pursuant to the writ of garnishment after Weera's death, should be included as a transfer made with actual intent to defraud. The Trustee has consistently argued that it should. The Defendants have not refuted this assertion and have not sought to distinguish this transfer based on its involuntary nature or its timing. For this reason, the court accepts the Trustee's argument that the transfer for funds pursuant to the garnishment was also made with actual intent to defraud.

[33]    The Michigan UVTA also provides a good faith defense to recipients of actual fraudulent transfers. Mich. Comp. Laws § 566.38(1). The court is not aware of any material differences in the two defenses, and the parties have not pointed to any. *See, e.g.*, Plaintiff's Trial Brief, AP Dkt. No. 101, at p. 19 n.8 ("Courts appear to apply the same definition of 'good faith' under the Bankruptcy Code and the uniform fraudulent transfer act.").

42

transferee to establish the elements of good faith and value. *Rieser v. Hayslip (In re Canyon Systems Corp.)*, 343 B.R. 615, 650-51 (Bankr. S.D. Ohio 2006) (citing *Wilson v. Carman (In re Blazo Corp.)*, 73 F.3d 361, 1995 WL 764130, at *3 (6th Cir. Dec. 27, 1995) (unpublished table decision)).

In this proceeding, there is no dispute that Rogers and Stephen were innocent investors in Wedgewood who had no knowledge of Weera's fraud at the time they made their investments. The Trustee has not argued otherwise. Instead, the Trustee generally asserts that the Defendants cannot establish a good faith defense to the actual fraudulent transfer claims because of information and other red flags that came to light after the Defendants invested in Wedgewood, including information uncovered as a result of the state court litigation.

i. *Good Faith*.

Many courts begin their analysis of good faith under § 548(c) by noting that neither the statute nor its legislative history define the term "good faith." *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 309 (S.D.N.Y. 2010) (citing *Jobin v. McKay (In re M & L Business Machine Co.)*, 84 F.3d 1330, 1335 (10th Cir. 1996); *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 800 (5th Cir. 2002)) (additional citations omitted). Due to this lack of "interpretive guidance," and because good faith is a somewhat vague concept that is recognized for not being "susceptible of precise definition," courts applying the § 548(c) good faith defense "have varied widely" in their approach to questions of good faith in the fraudulent conveyance context. *In re Telesphere Communications, Inc.*, 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994) (citing *In re Agricultural Research & Technology Group, Inc.*,

43

916 F.2d 528, 536 (9th Cir. 1990)) (additional citations omitted); *see also In re Hannover Corp.*, 310 F.3d at 800 ("[T]here is little agreement among courts as to what conditions ought to allow a transferee" a good faith defense under § 548(c). This "is not surprising, as the variables are manifold."). It is clear from a review of the caselaw that the availability of a good faith defense is to be determined on a case-by-case basis and is often "influenced substantially by the equities of the particular fact situation[]" that is before the court. *In re Telesphere Communications*, 179 B.R. at 557; *see Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995).

Although it is evident that § 548(c) is focused on the good faith of the recipient of an actual fraudulent transfer, courts have differed on whether that good faith is to be measured from an objective or subjective point of view. This distinction, which seems somewhat academic in theory, has practical import in this case, where there is no evidence that Rogers and Stephen were at all dishonest or complicit in the fraud perpetuated by Wedgewood and Weera, but where the Trustee has alleged reasonable investors in their position would have wised-up to the Debtor's scheme. Courts applying an objective standard generally look at what the transferee "objectively knew or should have known" about the debtor's fraudulent intent or potential insolvency, "instead of examining the transferee's actual knowledge from a subjective standpoint." *In re Sherman*, 67 F.3d at 1355. Under this standard, a recipient will lack good faith "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose" for making the transfer. *In re M & L Business Machine Co.*, 84 F.3d at 1338.

A more recent opinion, *In re Teleservices Group, Inc*., authored by the Honorable Jeffrey R. Hughes of this court, holds that a subjective standard is more appropriate when assessing the good faith of a recipient of an actual fraudulent transfer. *Meoli v. The Huntington National Bank (In re Teleservices Group, Inc.)*, 444 B.R. 767 (Bankr. W.D. Mich. 2011), *aff'd in part*, 848 F.3d 716 (6th Cir. 2017).  The *Teleservices* opinion observed that application of an objective standard "draws attention away from what has traditionally distinguished good faith from bad faith," which has "customarily involved a moral judgment."  *Id*. at 796-97 (citing *In re Bayou Group, LLC*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010), for the idea that "good faith" typically "denotes conformity with accepted standards of integrity, trust and good conduct" while "bad faith" suggests conduct that is "wrongful, improper or legally or ethically deplorable").  *Teleservices* persuasively argues that this shift of focus away from traditional notions of good faith is improper where the transfer at issue is alleged to have been made with actual intent to hinder, delay, or defraud creditors.  Instead, *Teleservices* holds that where a debtor made a transfer with actual intent to defraud his creditors, it is "the recipient's own honesty and integrity in accepting the transfer – i.e., his good faith – [that] must be put to the test" when assessing his defense to avoidance of that transfer.  *Id*. at 811.  Recognizing, however, that the recipient's culpability in accepting a transfer may be every bit as difficult to establish as the debtor's fraudulent intent in making the transfer, *Teleservices* suggests that a recipient's good faith may be assessed by his awareness of the traditional badges of fraud:

> If, for instance, the threat of an impending judgment is indicative of the debtor's fraud in making the transfer, awareness of that same threat should be a factor as well in determining the transferee's corresponding good faith in accepting the same.

45

*Id*. at 813-14.  Willful blindness to badges of a debtor's fraud may also suffice to establish the recipient's subjective lack of good faith.  Applying these principles to the facts before it, the *Teleservices* court ultimately stated that the appropriate test is whether the recipient of actual fraudulent transfers from the debtor ever reached a point "where it could no longer . . . cling to its belief" that the payments it was receiving from the debtor were legitimate.  On appeal, the Sixth Circuit upheld the bankruptcy court's formulation of this standard.  *Meoli v. The Huntington National Bank*, 848 F.3d 716, 734 (6th Cir. 2017).

Courts within the Sixth Circuit have adopted the *Teleservices* standard and have described it as setting forth a "hybrid" test of a transferee's good faith.  *See, e.g, Bash v. Textron Financial Corp*., 524 B.R. 745, 759 (N.D. Ohio 2015); *Tabor v. Kelly (In re Davis)*, 2011 WL 5429095, *24 (Bankr. W.D. Tenn. 2011) (unpublished opinion).  This hybrid test "looks at the subjective intent of the transferee in light of objective factors, such as his knowledge of the presence of 'badges of fraud' or 'red flags' that should have put him on inquiry notice."  *In re Davis*, 2011 WL 5429095 at *24-25 (framing the inquiry as having three parts: (1) determining what the transferee actually knew that would suggest insolvency or a fraudulent purpose by the transferor; (2) if the transferee had such knowledge, determining whether the transferee undertook a diligent inquiry; and (3) if the diligent inquiry did not uncover the fraud, determining whether any reasonable investigation would have revealed it).  This court agrees that the hybrid standard is the appropriate test of the Defendants' good faith.

When the court analyzes the Defendants' subjective knowledge of Weera's fraudulent activities or Wedgewood's potential insolvency – their "honesty and integrity" – the inescapable conclusion is that both Rogers and Stephen were acting in good faith

throughout their dealings with Weera.  Again, there is absolutely no evidence that Rogers and Stephen were at all aware of Weera's fraud when they first invested in Wedgewood. The evidence established that Rogers first met Weera through church friends and retained him to do legal work for her in 2005.  Over the course of several years, Weera built the Defendants' trust by meeting with them in person such that they eventually came to consider Weera a personal friend.

When Rogers, who was in the closest contact with Weera and who had the greatest capacity to understand and recall the details of the relationship, invested $155,000 in Wedgewood in April of 2016, the evidence established that she did so with the belief that she was investing in a real estate venture.  The rate of return on this investment was a reasonable five percent, and Rogers testified that she was not aware of any other "red flags," such as the terms of the LARA Consent Order, that might have alerted her to Weera's legal troubles.  Soon after the April 2016 investment, emails show Rogers expressing concern about the investment to Weera, but her concerns at this point were over the lack of documentation and follow-up from Weera, not that Weera or Wedgewood were engaged in fraud.

In May 2016, Weera visited the Defendants in their home, purportedly to review the subscription agreement and PPM required under the LARA Consent Order.  Rogers testified that she sat across the table from Weera and Stephen during this meeting and could not hear what they were discussing.  She stated that she never saw Stephen read the documents and explained that he likely would not have understood them if he had. Even if Rogers and Stephen had read and understood the paperwork at that time, it might have alerted them that Wedgewood was engaging in currency trading, not real estate

47

investment, but it would not otherwise have revealed that Wedgewood was a Ponzi scheme.[34] By directing the Defendants to set the documents aside until he could personally be there to explain (and likely misrepresent) them, Weera ensured that Rogers and Stephen never obtained even that level of knowledge.

When Rogers received her 1099 tax form in early 2017, the imprudence of Weera's investment advice about cashing out her annuities came to light. After meeting with her tax preparers around Easter, Rogers realized Weera had not been truthful with her about the potential tax liability that resulted from this transaction. By April 2017, Rogers had "lost faith" in Weera, and her tax advisors had encouraged her to hire an attorney to try to "get her money back." At this point, Rogers was distraught over the tax liability and upset about Weera's lies and foot-dragging but was still mostly in the dark when it came to Weera's fraudulent activities.

In mid-April 2017, Rogers and Stephen retained Attorney Foster to pursue litigation relating to "what appeared to be a fraudulent investment scheme" by Weera. Rogers testified that information she received from Attorney Foster in the early discovery phase of the state court litigation convinced her that the money she and Stephen had invested in Wedgewood was "gone" and that Weera had transferred it overseas. At this point, she acknowledged that she thought Weera had likely committed a crime. But the nature of the crime she suspected had only to do with Weera stealing their money, not necessarily

---

[34] This is consistent with Attorney Foster's testimony regarding his review of these documents with the Defendants at their initial meeting. The documents revealed that Wedgewood was engaged in currency trading which led Attorney Foster to believe that Wedgewood was not a suitable investment for Rogers and Stephen and that Weera may have been violating securities law. Any other theories derived from review of the financial statements were deductions or assumptions Attorney Foster made based on the "flavor" of the documents. (Dft. Exh. A, p. 18-19.)

48

with any kind of broader scheme.  The amended complaint filed by Attorney Foster in the state court litigation in December 2017 used the term Ponzi scheme, particularly with regard to the initial $50,000 investment made by Stephen.  However, there is no evidence that Rogers read the amended complaint or understood the meaning of these allegations.  Even after the state court lawsuit was settled and downpayments were received, there is no evidence that Rogers suspected Wedgewood was a Ponzi scheme.  She testified that it never occurred to her that the settlement payments came from other investors' money or that Wedgewood was insolvent.  She can hardly be faulted for this, as a majority of the money paid under the Settlement Agreement came from the sale of the Caledonia farm property, and not from other investor's funds.

Under these circumstances, the court finds that Rogers acted in good faith.  She was not complicit in Weera's fraud and was not aware of any red flags when she made her investment.  When red flags came up after her investment in Wedgewood, they pointed to Weera's ineptitude and lack of follow-through, but not to a broader fraudulent scheme.  In addition, each time a red flag did crop up, Rogers acted diligently and appropriately.  She emailed Weera to request documentation and explanations.  When the tax implications of Weera's bad advice came to light, she acted on the recommendation of her tax professionals and sought help from an attorney.  She ultimately retained Attorney Foster to investigate where her money had gone and to file a lawsuit to get it back.  This is not a situation where Rogers discovered the fraudulent scheme and tried to get her money out first to the detriment of other investors.  Instead, Rogers was advised that Weera may have stolen from her, filed a lawsuit to recover her money, and eventually got it back.  The court cannot conclude that Rogers' exercise of

49

her legal rights to recover her investment, which she believed was stolen by Weera and parked overseas, would somehow defeat her good faith defense, particularly given her lack of knowledge of or complicity in Weera's scheme.  Rogers acted in good faith.

The case for good faith is even stronger for Stephen, whose lack of direct communication with Weera and general inability to understand or recall the financial transactions at issue makes it nearly impossible to charge him with knowledge of fraud or potential red flags.  The evidence presented at trial established that Stephen initially came to know Weera through Rogers.  Throughout the years, he communicated with Weera mostly through Rogers.  At trial, Stephen could not recall much about his initial investments in Wedgewood or the circumstances surrounding them.  However, Rogers recalled Stephen being told that he was investing in a Texas real estate venture when he made his first investment in Wedgewood in 2013.  According to Rogers, Stephen made his additional investments in March and April 2016 with that same belief.   After this point, contemporaneous statements made in Rogers' emails, along with her trial testimony, confirm that Stephen's knowledge and recollection about the investments and Weera's actions were extremely limited.  Under those circumstances, the court cannot find that he was aware of, or capable of acting on, any red flags regarding Weera's fraud.  Stephen acted in good faith.

Even if Rogers and Stephen did not have sufficient knowledge of Wedgewood's fraud to defeat their good faith defense, the Trustee argues that their state court lawyer, Attorney Foster, did have such knowledge and that his knowledge should be imputed to the Defendants.   Under Michigan law, it is generally held that "where a client is represented by an attorney, knowledge acquired by the attorney while acting within the

50

scope of his authority is by fiction of law the knowledge of the client." *Katz v. Kowalsky*, 295 N.W. 600, 603 (Mich. 1941); *see also Restatement (Third) of Agency*, § 5.03 (2006).[35]

The Defendants argue that Attorney Foster's knowledge and beliefs about Wedgewood being a Ponzi scheme may not be imputed to the Defendants because imputed knowledge cannot be used to establish an individual's subjective lack of good faith as a matter of law. In support of this argument, the Defendants cite several cases from jurisdictions outside of Michigan.[36] One such case, *Jehly v. Brown*, 327 P.3d 351 (Colo. App. 2014), involved a fraudulent concealment claim against the seller of a home. The court noted that, under Colorado law, fraudulent concealment required proof that the defendant had actual, subjective knowledge of a material fact that was not disclosed.

---

[35]    The *Restatement* notes that the general rule that "notice of a fact that an agent knows or has reason to know is imputed to the principal" only applies when "knowledge of the fact is material to the agent's duties to the principal" and does not apply if the agent is acting "adversely to the principal" or "is subject to a duty to another not to disclose the fact to the principal." *Restatement (Third) of Agency*, § 5.03. These criteria are not implicated in this case, where it is undisputed that any information Attorney Foster acquired about the Ponzi scheme was acquired while he was acting on the Defendants' behalf and was not in any way adverse to their interests.

[36]    The Defendants also cite one decision from this bankruptcy court, *In re Wantz*, 647 B.R. 541 (Bankr. W.D. Mich. 2023). In *Wantz*, the court considered whether a debtor who had failed to disclose a personal injury claim prior to the closing of her chapter 7 case should be permitted to file amended schedules claiming an exemption in the claim after the case was reopened. Discussing whether the debtor's failure to timely amend her schedules constituted "excusable neglect" under Fed. R. Bankr. P. 9006(b)(1), the court held that the debtor's "sincere, emotional, and credible" testimony established her good faith and refused to equate her "confusion regarding the existence of a claim with a lack of good faith." *Id*. at 553. The court also considered the debtor's relationship with her personal injury attorneys in its excusable neglect analysis. Although the court noted the general rule that the knowledge of an attorney is imputed to the client, it ultimately refused a strict application of that rule in light of specific characteristics of the debtor's relationship with her personal injury attorneys, including that the debtor "received a minimal level of communication" from them. *Id*.

The debtor in *Wantz*, with her lack of sophistication and genuine confusion about the existence of her claim, certainly resembles the Defendants in this proceeding. However, *Wantz* was decided in an entirely different legal context. It illustrates the wholistic and fact specific nature of any good faith analysis, but does not support the Defendants' argument that Attorney Foster's knowledge cannot be imputed to the Defendants as a matter of law.

This type of knowledge required "an active or conscious belief or awareness" of the concealed facts and is distinguishable from standards that only require proof that a defendant "should have or might have known" a particular fact.  *Id*. at 353-54.  For this reason, the court held that the knowledge of facts that were known to the defendant's contractor, but which had not been communicated to him, could not be imputed to the defendant for purposes of the fraudulent concealment claim. *Id*. at 355.

Although the reasoning in *Jehly* is persuasive, it is distinguishable from the present case.  Unlike the fraudulent concealment standard discussed in *Jehly*, the good faith standard that applies under § 548(c) involves considerations beyond the Defendants' actual, conscious awareness of a potential Ponzi scheme, such as whether they were willfully blind to potential red flags or badges of fraud.  Accordingly, while the good faith standard adopted by this court is primarily a "subjective" or "hybrid" standard, the court believes that analysis required under § 548(c) is slightly broader than the legal standards addressed by the courts in the cases cited by the Defendants.  *See, e.g., Wardley Better Homes & Gardens v. Cannon*, 61 P.3d 1009, 1016-17 (Utah 2002) (under Utah law, imputed knowledge cannot be used "when determining an individual's subjective mental state;" unlike a corporation, a principal who is a natural person "is capable of holding a subjective belief or intent independent of his agent"); *Harte v. United Benefit Life Ins. Co*., 424 P.2d 329, 332 (Cal. 1967) (wife's knowledge of husband's cancer diagnosis not imputed to husband when husband's good faith in accepting insurance policy is to be determined based on his actual knowledge of relevant facts); *Snook v. Netherby*, 269 P.2d 195, 198 (Cal. App. 1954) (under California statute, bad faith breach of contract for sale

of real estate requires actual knowledge and cannot be based on knowledge imputed from agent).

Ultimately, however, the court need not decide the legal issue raised by the Defendants because the court finds, as a matter of fact, that Attorney Foster did not have actual knowledge that Wedgewood was a Ponzi scheme. Attorney Foster's deposition testimony established that his original focus in filing the state court complaint was on the unsuitability of the investments recommended by Weera and his unregistered sale of securities. Subsequent discovery revealed that Weera withdrew the $585,000 invested by the Defendants in March and April 2016 from Wedgewood within days or weeks of the investments and transferred those funds to offshore accounts. Bank records also showed several transfers being made to other individuals after Stephen's $50,000 investment in 2013. Although Attorney Foster did not know the specific circumstances of these transfers, including whether the individuals listed were actual investors in Wedgewood, and never "substantiated" these claims, this evidence formed the basis for the Ponzi scheme allegations in the amended complaint. Attorney Foster testified that, in all other respects, his use of the term "Ponzi scheme" in the state court litigation was conjecture or puffing. He stated at his deposition that he never arrived at the belief that Wedgewood was a Ponzi scheme, at least not as to the investments made by Rogers and Stephen.

Although the court acknowledges that Attorney Foster's deposition testimony, which occurred well after the filing of this adversary proceeding, was somewhat self-serving, the testimony is entirely consistent with the state court pleadings and his contemporaneous emails to Rogers. These documents demonstrate that Attorney Foster's primary concern – which was communicated to and shared by Rogers – was that

53

Weera had stolen the Defendants' money and transferred it overseas.  Whatever Attorney Foster may have suspected about Wedgewood's operations, there is no evidence that he knew it was a Ponzi scheme.  Under the circumstances, there is no actual knowledge of the scheme that can be imputed to the Defendants to undermine the court's previous determination that they accepted the transfers from Wedgewood in good faith.

ii.      *Value Given in Exchange for the Transfer.*

In addition to showing that they took the challenged transfers in good faith, Rogers and Stephen must also prove that they "gave value to [Wedgewood] in exchange" for the transfers to establish their defense to the Trustee's actual fraudulent transfer claims.  11 U.S.C. § 548(c); *Meoli v. The Huntington National Bank*, 848 F.3d 716, 729 (6th Cir. 2017).  For purposes of § 548, "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor" and is generally viewed as the "flip side" of lack of reasonably equivalent value required to avoid a transfer as constructively fraudulent under § 548(a)(1)(B).  *See* 11 U.S.C. § 548(d)(2)(A); *The Ponzi Book*, at § 4.02[1][g][i]; *Rieser v. Hayslip (In re Canyon Systems Corp.)*, 343 B.R. 615, 651 (Bankr. S.D. Ohio 2006) (explaining that the term "reasonably equivalent value" has "the same fundamental meaning" as "value" under § 548(c)).  The reasonable equivalence of the value is measured by comparing the property transferred with the value of the property received in exchange.  *In re Canyon Systems Corp.*, 343 B.R. at 639 (discussing "reasonably equivalent value" in the context of a constructive fraudulent transfer claim).  "Typically, a dollar-for-dollar reduction in debt constitutes – as a matter of law – reasonably equivalent value for purposes of the fraudulent-transfer statutes." *Southeast Waffles, LLC v. United States Dept. of Treasury (In re Southeast Waffles, LLC)*, 702 F.3d 850, 857 (6th Cir. 2012).

54

The parties in this case primarily focused on the good faith aspects of the Defendants' § 548(c) defense but did not give careful attention to the "for value" element. To begin, the parties make conflicting and inconsistent arguments about whether the transfers made to Rogers and Stephen should be analyzed separately or jointly. The Trustee argues that the recovery of any transfers avoided in this proceeding should be imposed jointly on both Defendants, primarily because the Settlement Agreement establishes a joint debt to Rogers and Stephen[37] and because their proof of claim was filed jointly and not based on their individual investments in Wedgewood. At the same time, the Trustee's fraudulent transfer arguments fail to recognize that the Defendants were jointly owed a total of $900,000 under the Settlement Agreement.[38] To the extent the subsequent payments received from Wedgewood resulted in a dollar-for-dollar reduction in this joint debt, such payments would presumably have been made for "value" under § 548(c). However, instead of addressing this point,[39] the Trustee argues that the value given in exchange for the transfers received by the Defendants should be measured against their restitution claim for the return of their combined initial investments in

---

[37]    *See* Plaintiff's Closing Argument, AP Dkt. No. 145, at p. 52 ("While they made separate investments in Wedgewood, they pursued and recovered from Wedgewood on the basis that they held a joint claim by aggregating their separate investments. The settlement agreement and accompanying promissory note in the State Court Case resulted in a $900,000 settlement payment owing to the "Plaintiffs" (i.e., Rogers-Stephen jointly); there was no mention of or allocation for their separate claims.").

[38]    The Trustee comes closer to recognizing this fact in connection with his preference claim, where he argues that it is undisputed that the Defendants were owed an antecedent debt by Wedgewood as reflected in the "$340,000+ consent judgment." *See* Plaintiff's Closing Argument, AP Dkt. No. 145, at p. 44.

[39]    The Trustee did not, for example, argue that the Settlement Agreement itself was an avoidable fraudulent transfer, even though Weera's actions in causing Wedgewood to incur those obligations may also have been in furtherance of his overall fraudulent scheme.

55

Wedgewood, which totaled $635,000.[40] According to the Trustee's calculation, the total value of the transfers received, $658,063.15, exceeded the value of the Defendants' combined $635,000 in investments by $23,063.15. For their part, the Defendants argue that the transfers must be analyzed separately and "dissected by date and circumstance" for purposes of the good faith analysis.[41] They note, however, that the Trustee conceded both that Rogers and Stephen gave value for the transfers and that the amount of that value is $635,000. The Defendants do not assert that the value given in exchange for the transfers exceeds this amount; they have not argued for instance, that the Settlement Agreement was a novation of the prior debt or restitution claim, or that they are entitled to credit for interest on their original investment.

The court questions whether the parties' view of the value exchanged in this case, which they appear to share, properly accounts for the technicalities of the transfers at issue and the legal significance of the Settlement Agreement. For instance, to the extent the value given by the Defendants is to be measured by their initial investments, those investments were made by Rogers and Stephen separately and in their own names. The transfers the Trustee seeks to avoid were also made separately,[42] in amounts that were unilaterally chosen by Weera and which were not proportionate to the Defendants' individual investments. However, because the parties have essentially agreed that the

---

[40]     *See* Plaintiff's Closing Argument, AP Dkt. No. 145, at p. 33 n. 15.

[41]     *See* Defendants' Closing Argument, AP Dkt. No. 144, at p. 3.

[42]     The Settlement Agreement downpayment was made via three cashier's checks, one payable to Rogers and Foster, one payable to Stephen and Foster, and one payable to all three. The first installment payment was made via a check payable to Rogers and Foster. The garnished funds appear to have been sent directly to Attorney Foster and deposited in his IOLTA account.

56

value given by the Defendants should be determined based on the total amount of their initial investments in Wedgewood, the court will use that benchmark in its analysis of value.  Of the options available to the court, the approach advocated by the parties also best reflects the restitution claim theory, the general difficulties and shortcuts that may be required when tracing funds through Ponzi schemes,[43] and the manner in which the funds were ultimately distributed to Rogers and Stephen.[44]

For these reasons, the court determines that Rogers and Stephen gave value for $635,000 of the $658,063.15 they received and have established a § 548(c) defense to the Trustee's actual fraudulent transfer claims on this basis.  The difference, $23,063.15, may be avoided by the Trustee under § 548(a)(1)(A) and the Michigan UVTA.

2.  <u>Constructive Fraudulent Transfer Claim</u>.

The Trustee has also asserted that the transfers made by Wedgewood to the Defendants under the Settlement Agreement and garnishment are avoidable as constructive fraudulent transfers.  Section § 548(a)(1)(B) governs constructive fraudulent transfers and provides that a trustee "may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor," that was "made or incurred on or within 2 years before the date of the filing of the petition," if the debtor:

---

[43]      For example, one commentator has described the "netting theory" often employed in the context of Ponzi schemes, under which "a trustee need only determine whether an investor was a net-winner or net-loser when ascertaining whether the investor received profit" rather than matching-up payments with investments, trying to determine how payments should be credited, or attempting to follow the parties' characterization of specific transfers.  *See* Mark A. McDermott, *Ponzi Schemes & the Law of Fraudulent Transfers*, 72 Am. Bankr. L.J. 157, 169 (1998).  The article explains that such an approach "may be the only workable rule in the typical Ponzi-scheme case, where documentation of transfers is less than complete, payments are sporadic and not always in accordance with the documentation of the investment, and neither the investor nor the debtor can recall precisely what the parties intended."  *Id*.

[44]      Attorney Foster explained that the funds received from Wedgewood were distributed on pro rata basis pursuant to a side agreement between Rogers and Stephen.

. . . .

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

        (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

        (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . .

11 U.S.C. § 548(a)(1)(B).[45] To prevail on his constructive fraud claim, the Trustee must prove by a preponderance of evidence that the elements of § 548(a)(1)(B) have been met. *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 F. App'x 337, 341 (6th Cir. 2006) (unpublished opinion).

The court finds that Wedgewood was continuously insolvent from May 1, 2012, through the filing of the bankruptcy case on November 15, 2018. The expert testimony and report of Lytle establishes that, as of May 1, 2012, the real property and cash held by Wedgewood had a total estimated value of approximately $1.1 million whereas the estimated amounts owed to investors at that time totaled over $3.6 million. The amount by which Wedgewood was insolvent generally fluctuated between $2.3 million and $6.8 million during the six-year prepetition period. The insolvency element of the Trustee's constructive fraudulent transfer claim is easily satisfied. Wedgewood's on-going

---

[45] Constructive fraudulent transfers are addressed in § 566.35(1) of the Michigan UVTA. "The elements that must be shown under this section of the Michigan Act are virtually identical to those under § 548(a)(1)(B)." *Shapiro v. Woodberry (In re Woodberry)*, 621 B.R. 665, 673 (Bankr. E.D. Mich. 2020).

insolvency, coupled with the court's prior findings that it was operated as a Ponzi scheme, also lead the court to conclude that Wedgewood was operating with unreasonably small capital and was intentionally incurring debts that were beyond its ability to repay. *See Rieser v. Hayslip (In re Canyon Systems Corp.*), 343 B.R. 615, 651 (Bankr. S.D. Ohio 2006) (citing *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993) (when debtor operates primarily on fraudulently obtained funds and has little to no legitimate operating capital it "would seem axiomatic that the debtor was operating its business with unreasonably small capital"), *aff'd*, 1995 WL 381741 (6th Cir. June 26, 1995); *Liebersohn v. Campus Crusade for Christ (In re C.F. Foods, L.P.)*, 280 B.R. 103, 116-17 (Bankr. E.D. Penn. 2002) (operating the debtor's business as a Ponzi scheme shows a subjective intent to incur debts beyond the debtor's ability to repay)) (additional citations omitted).

Accordingly, the primary issue with regard to the Trustee's constructive fraudulent conveyance claim is whether Wedgewood received reasonably equivalent value in exchange for the transfers to the Defendants. As the court previously noted with reference to the Defendants' § 548(c) defense, the standards for determining value under § 548(c) and reasonably equivalent value under § 548(a)(1)(B) are substantially similar. *In re Canyon Systems Corp.*, 343 B.R. at 651. The main difference is that in a constructive fraud context, the equivalence of the value exchanged is part of the Trustee's prima facie case and is not solely a defense to be raised by the Defendants. As a result, the Trustee bears the burden of proof on this element. This distinction is not particularly relevant in the present proceeding, where the court has already determined that the Defendants

59

acted in good faith and gave value to the extent of their initial combined investment of $635,000.

For the same reasons identified in the court's discussion of § 548(c), the court finds that the Debtor received reasonably equivalent value in exchange for $635,000 of the transfers it made to the Defendants. The transfers received by the Defendants, which totaled $658,063.15, exceeded this value by $23,063.15. The Trustee may therefore avoid the transfers as constructively fraudulent under § 548(a)(1)(B) and the Michigan UVTA in the amount of $23,063.15.

B. *The Preference Claim*.

In his final cause of action, the Trustee seeks to avoid the $98,063.15 transfer of funds from Wedgwood's account at Chemical Bank that occurred pursuant to the writ of garnishment as a preferential transfer under § 547(b). To prevail on this claim, the Trustee must establish that a transfer of an interest of the debtor in property was made and that the transfer was:

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made –
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if –
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and

60

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The Trustee must prove each of these statutory elements by a preponderance of the evidence. 11 U.S.C. § 547(g).

In this proceeding, there is no dispute that the garnishment constituted a transfer of Wedgewood's property to or for the benefit of Rogers and Stephen, who were creditors and were owed an antecedent debt under the Settlement Agreement and state court consent judgment. The expert testimony from Lytle established that Wedgewood was insolvent when this transfer was made, and Trustee Moyer's testimony proved that the garnishment enabled the Defendants to receive more than other unsecured creditors are likely to receive in this case. The sole issue is whether this transfer occurred during the 90-day preference period – i.e., on August 17, 2018 or later – for purposes of § 547(b)(4).

Under the Bankruptcy Code, a transfer is generally deemed to have been made "at the time such transfer is perfected." 11 U.S.C. § 547(e)(2)(B). The Code further states that perfection occurs "when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1)(B). "A more precise definition of 'perfection' is left to state law." *Battery One-Stop, Ltd. v. Atari Corp. (In re Battery One-Stop, Ltd.)*, 36 F.3d 493, 495 (6th Cir. 1994).

Michigan law provides that a garnishment lien attaches when the writ of garnishment is served. *See PNC Equip. Finance, LLC v. Lopez (In re Lopez)*, 2021 WL 3083527, *2 (Bankr. W.D. Mich. 2021) (unpublished opinion) (citing *Michigan Tractor & Mach. Co. v. Elsey*, 549 N.W.2d 27, 29 (Mich. App. 1996) ("Michigan follows the general rule that a garnishment lien attaches upon service of the writ."); Mich. Ct. Rule 3.101 (Garnishment After Judgment)). Where, as here, the garnishment occurs post-judgment

61

and applies to funds held in a bank account, the garnishment lien is also perfected upon service of the writ on the garnishee bank. *In re Battery One-Stop*, 36 F.3d at 496 (holding that a transfer of garnished funds under Ohio law is perfected upon service of the garnishment order because that action "binds" the funds and, after that time, no other creditor can acquire a superior lien in the funds). Accordingly, the operative date of the transfer at issue in this proceeding is the date on which the writ of garnishment was served on Chemical Bank.[46]

The Michigan Court Rules provide that a writ of garnishment and related documents and fees are to be served in accordance with the general rules for service of process set forth in Rule 2.105. Mich. Ct. Rule 3.101(F)(1). Under Rule 2.105, service may be made on a corporate entity such as Chemical Bank by serving the writ of garnishment "on a director, trustee, or person in charge of an office or business establishment of the corporation and sending a summons and a copy of the complaint by registered mail, addressed to the principal office of the corporation." Mich. Ct. Rule 2.105(D)(2). The rule further provides that an "action shall not be dismissed for improper service of process unless the service failed to inform the defendant of the action within the time provided in these rules for service." Mich. Ct. Rule 2.105(K)(3). A writ of garnishment must be served on the garnishee within 182 days of its issuance. Mich. Ct. Rule 3.101(F)(1).

---

[46]    The Trustee has acknowledged that although the actual transfer of funds from Wedgewood's Chemical Bank account to Attorney Foster occurred within the preference period, this transfer may not be avoided as a preference if the Defendants' lien attached and was perfected outside of the 90-day period. *See* Plaintiff's Closing Argument, AP Dkt. No. 145, at p. 46-47 & n. 23. The Trustee correctly argues that "the date of service is the critical inquiry." *Id.* at 47.

In this case, the unrefuted testimony of Attorney Foster and the proof of service attached to the writ of garnishment establish that the writ was served on Shalitha Bennett at Chemical Bank on August 14, 2018, at 4:03 p.m.  David Schmid from Huntington Bank testified that the bank's records also confirmed that the writ was actually received on this date.  Schmid testified that Bennett was an Assistant Branch Manager and Attorney Foster stated that Bennett held herself out as the person at the branch who was authorized to accept service of the writ.  The inescapable conclusion is that Bennett, as a person in charge of the Chemical Bank branch office, was properly served with the writ of garnishment on August 14, 2018.  Although there is no evidence that Attorney Foster followed up on this personal service by sending a copy of the writ by registered mail to the bank's principal office, this defect does not render the personal service ineffective because the evidence clearly establishes that the personal service resulted in the bank being informed of the garnishment.

For these reasons, the court concludes that the garnishment lien in this proceeding attached and was perfected when it was served on Chemical Bank on August 14, 2018. This was ninety-three (93) days prior to the filing of Wedgewood's bankruptcy case.  The transfer therefore occurred outside of the preference period, and the Trustee has not established the § 547(b)(4) element of his preference claim.  The preference claim will be dismissed for no cause of action.

C.  *Recovery of Avoided Transfers and Pre-Judgement Interest*.

Having avoided $23,063.15 of the transfers made by Wedgewood to the Defendants as actual and constructive fraudulent transfers, the Trustee seeks to recover the transfers or their value from the Defendants.  *See Suhar v. Burns (In re Burns)*, 322

F.3d 421, 425 (6th Cir. 2003) (describing recovery as the "statutory mechanism through which property may be returned to the estate"). Recovery is governed by § 550, which states:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.
>
> (b) The trustee may not recover under section (a)(2) of this section from—
>
> > (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> >
> > (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550. In this case, each of the transfers from Wedgewood was initially deposited in Attorney Foster's IOLTA or operating account. Notwithstanding this fact, there is no question that Rogers and Stephen were the individuals for whose benefit the transfers were made.[47] They have not argued to the contrary. As a result, the Trustee is entitled to recover the value of the avoided transfers, $23,063.15. In accordance with the Trustee's request, the court will enter a judgment in this amount against Rogers and Stephen jointly.

---

[47] The court previously held, in a bench opinion on a motion for summary judgment filed by Attorney Foster, that Attorney Foster was a "mere conduit," and not the initial transferee, of the transfers that were deposited into his IOLTA account. *See* Order Granting in Part and Denying in Part Defendant David Foster's Motion for Summary Judgment, AP Dkt. No. 47.

Finally, the Trustee has requested that the court impose both prejudgment and post-judgment interest on this recovery.  Post-judgment interest in civil cases, including bankruptcy cases, is governed by 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case" from "the date of the entry of the judgment" and at a rate specified in the statute, which is often referred to as the federal judgment interest rate.  Neither the Bankruptcy Code nor 28 U.S.C. § 1961 specifically addresses pre-judgment interest.  However, it "is well-settled that, unless prohibited by a statute, bankruptcy courts, as units of the district court under 28 U.S.C. § 151, have broad discretion in determining whether to award prejudgment interest based on the particular equities of a case."  *Global Technovations, Inc. v. Onkyo U.S.A. Corp. (In re Global Technovations, Inc.)*, 431 B.R. 739, 775 (Bankr. E.D. Mich. 2010) (explaining that prejudgment interest may be "appropriate where it is necessary to fully compensate a party for the lost use of its money and to prevent the defendant's unjust enrichment"), *aff'd*, 694 F.3d 705 (6th Cir. 2012).

With regard to the appropriate rate of prejudgment interest, courts often apply the federal judgment interest rate set forth in 28 U.S.C. § 1961(a), particularly "where the Bankruptcy Code or other federal statutes supply the substantive right."  *In re Global Technovations, Inc.*, 431 B.R. at 775-76.  The Sixth Circuit has cautioned against a mechanical application of this rate, however, and has held that a "proper determination of pre-judgment interest involves a consideration of various case-specific factors and competing interests to achieve a just result*." Schumacher v. AK Steel Corp. Retirement Accumulation Pension Plan*, 711 F.3d 675, 686 (6th Cir. 2013) (discussing prejudgment interest on ERISA claims).  Courts also have "broad discretion in determining the time

65

from which prejudgment interest should accrue." *In re Global Technovations, Inc.*, 431 B.R. at 775.   In the context of fraudulent transfers, some courts have awarded prejudgment interest from the date of the avoided transfer, but more commonly, courts find that the interest begins to accrue when a demand is made for return of the property or on the date an adversary complaint is filed.  *Id*. at 775-76.

The Trustee has pursued avoidance and recovery of the transfers at issue in this proceeding on behalf of the Wedgewood bankruptcy estate and the proceeds from that recovery will be distributed to all creditors.   This proceeding was filed on November 6, 2020, and the court finds it equitable and appropriate to award prejudgment interest from this date.   The court will also apply the federal judgment interest rate established under 28 U.S.C. § 1961(a) which was in existence as of November 6, 2020.   The court finds an award of prejudgment interest at this rate appropriate under the circumstances of this proceeding, which involves Defendants who were in no way complicit in the underlying Ponzi scheme but who ultimately received "fictitious profits" in excess of their initial investments and at the expense of other creditors.   This interest rate is also appropriate because the Plaintiff is a bankruptcy estate, which would likely receive nominal, if any, return on its investments during the pendency of the case.   Post-judgment interest will be imposed pursuant to 28 U.S.C. § 1961(a) as of the date of entry of the judgment.

## V.   CONCLUSION.

Shawn Weera, and his company Wedgewood Properties, LLC, were fraudsters. Weera established personal connections with elderly individuals to provide them estate planning and financial advice.  Defendants Connie Rogers and William Stephen were two of Weera's victims, introduced to Weera through a church friend.  After building their trust

66

for many years, Weera convinced Rogers and Stephen to invest a total of $635,000 in Wedgewood and to fund this investment, in large part, by cashing out their retirement annuities.   This advice caused Rogers and Stephen to suffer significant tax consequences, and ultimately led them to seek legal counsel.  With the help of Attorney Foster, Rogers and Stephen sued Wedgewood and Weera and recovered over $658,000, an amount slightly in excess of their initial investments.

Through this adversary proceeding, the Trustee seeks to avoid those payments as actual and constructive fraudulent transfers under the Bankruptcy Code and the Michigan UVTA and to recover the payments for the benefit of all of Wedgewood's creditors.  For purposes of the Trustee's actual fraud claims, brought under § 548(a)(1)(A) and the Michigan UVTA, the court has little trouble concluding that Wedgewood and Weera made the transfers with actual intent to defraud creditors.  Wedgewood was a Ponzi scheme, with few assets and no discernible legitimate business operations.  But Rogers and Stephen were in no way complicit in this fraud, and they acted honestly and appropriately as Weera's fraudulent activities – which included evidence that he had transferred their money overseas and that Wedgewood was an unsuitable investment for them, but not necessarily that it was a Ponzi scheme – slowly came to their attention.  Under the facts of this case, the court concludes that Rogers and Stephen took the transfers in good faith and for value to the extent of their $635,000 investments and have established a defense to the Trustee's fraudulent transfer claim in that amount.  To the extent Rogers and Stephen received amounts from Wedgewood in excess of their initial investments, the Trustee may also avoid that transfer as constructively fraudulent under § 548(a)(1)(B) and the Michigan UVTA.   The Trustee may recover the amount by which the transfers

67

exceeded their initial investment, $23,063.15, plus pre- and post-judgment interest as provided herein, from Rogers and Stephen pursuant to § 550.  Finally, the preference count of the Trustee's complaint shall be dismissed for no cause of action.  A separate judgment shall enter accordingly.

**IT IS SO ORDERED.**

Dated April 4, 2024



James W. Boyd
United States Bankruptcy Judge